**UNITED STATES v. PARAMOUNT
PICTURES, Inc. et al.**
No. 87–273.

United States District Court
S. D. New York.

July 25, 1949.

See also D.C., 75 F.Supp. 1002.

Before AUGUSTUS N. HAND, Circuit Judge, HENRY W. GODDARD and ALFRED C. COXE, District Judges.

Herbert A. Bergson, Assistant Attorney General, Robert L. Wright and J. Francis Hayden, Special Assistants to the Attorney General, George H. Davis, Jr., Washington, D. C., and Harold Lasser, New York City, Special Attorneys, for United States of America.

Davis, Polk, Wardwell, Sunderland & Kiendl, J. Robert Rubin, New York City, for defendant Loew's, Inc.; John W. Davis, J. Robert Rubin, S. Hazard Gillespie, Jr., and Benjamin Melniker, New York City, of counsel.

Joseph M. Proskauer and Robert W. Perkins, New York City, for the Warner defendants; Joseph M. Proskauer, Robert W. Perkins, J. Alvin Van Bergh, Howard Levinson, and Harold Berkowitz, New York City, of counsel.

James F. Byrnes, Washington, D. C., Dwight, Harris, Koegel & Caskey, New York City, for Twentieth Century-Fox Film Corporation and National Theatres Corporation, defendants; James F. Byrnes, Otto E. Koegel, John F. Caskey, and Frederick W. R. Pride, New York City, of counsel.

Schwartz & Frohlich, New York City, for defendant Columbia; Louis D. Frohlich and Everett A. Frohlich, New York City, of counsel.

Charles D. Prutzman, New York City, for Universal defendants; Cyril S. Landau, New York City, of counsel.

O'Brien, Driscoll & Raftery, New York City, for defendant United Artists Corporation; Edward C. Raftery and George A. Raftery, New York City, of counsel.

AUGUSTUS N. HAND, Circuit Judge.

This case comes before us after a decision by the Supreme Court affirming in part and reversing in part our decree and findings of December 31, 1946, 70 F.Supp. 53. United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. Under our findings of fact, we held that there had been violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 2, which were summarized in the conclusions of law as follows:

"7. The defendants Paramount Pictures, Inc.; Paramount Film Distributing Corporation; Loew's Incorporated; Radio-Keith-Orpheum Corporation, RKO Radio Pictures, Inc.; Keith-Albee-Orpheum Corporation; RKO Proctor Corporation; RKO Midwest Corporation; Warner Bros. Pictures, Inc.; Vitagraph, Inc.; Warner Bros. Circuit Management Corporation; Twentieth Century-Fox Film Corporation; National Theatres Corporation; Columbia Pictures Corporation; Columbia Pictures of Louisiana, Inc.; Universal Corporation; Universal Film Exchanges, Inc.; Big U Film Exchange, Inc.; and United Artists Corporation have unreasonably restrained trade and commerce in the distribution and exhibition of motion pictures and attempted to monopolize such trade and commerce, * * * in violation of the Sherman Act by:

"(a) Acquiescing in the establishment of a price fixing system by conspiring with one another to maintain theatre admission prices;

"(b) Conspiring with each other to maintain a nation-wide system of runs and clearances which is substantially uniform in each local competitive area.

"8. The distributor defendants Paramount Pictures, Inc.; Paramount Film Distributing Corporation; Loew's, Incorporated; Radio-Keith-Orpheum Corporation; RKO Radio Pictures, Inc.; Warner Bros. Pictures, Inc.; Vitagraph, Inc.; Twentieth Century-Fox Film Corporation; Columbia Pictures Corporation; Columbia Pictures of Louisiana, Inc.; Universal Corporation; Universal Film Exchanges, Inc.; Big U Film Exchange, Inc.; and United Artists Corporation, have unreasonably restrained trade and commerce in the distribution and exhibition of motion pictures and attempted to monopolize such trade and commerce, * * * in violation of the Sherman Act by:

"(a) Conspiring with each other to maintain a nation-wide system of fixed minimum motion picture theatre admission prices;

"(b) Agreeing individually with their respective licensees to fix minimum motion picture theatre admission prices;

"(c) Conspiring with each other to maintain a nation-wide system of runs and clearances which is substantially uniform as to each local competitive area;

"(d) Agreeing individually with their respective licensees to grant discriminatory license privileges to theatres affiliated with other defendants and with large circuits as found in finding No. 110 above;

"(e) Agreeing individually with such licensees to grant unreasonable clearance against theatres operated by their competitors;

"(f) Making master agreements and franchises with such licensees;

"(g) Individually conditioning the offer of a license for one or more copyrighted films upon the acceptance by the licensee of one or more other copyrighted films, except in the case of the United Artists Corporation;

"(h) The defendants Paramount and RKO making formula deals..

"(9) The exhibitor-defendants, Paramount Pictures, Inc.; Loew's, Incorporated; Radio-Keith-Orpheum Corporation; Keith-Albee Orpheum Corporation; RKO Proctor Corporation; RKO Midwest Corporation; Warner Bros. Pictures, Inc.; Warner Bros. Circuit Management Corporation; Twentieth Century-Fox Film Corporation; and National Theatres Corporation have unreasonably restrained trade and commerce in the distribution and exhibition of motion pictures * * * in violation of the Sherman Act by:

"(a) Jointly operating motion picture theatres with each other and with independents through operating agreements or profit-sharing leases;

"(b) Jointly owning motion picture theatres with each other and with independents through stock interests in theatre buildings;

"(c) Conspiring with each other and with the distributor-defendants to fix substantially uniform minimum motion pictures theatre admission prices, runs, and clearances;

"(d) Conspiring with the distributor-defendants to discriminate against independent competitors in fixing minimum admission price, run, clearance, and other license terms."

As a remedy for the violations which we have summarized above, we held that a system of competitive bidding for film licenses should be introduced, saying in Finding 85 that:

"Competition can be introduced into the present system of fixed admission prices, clearances, and runs, by requiring a defendant-distributor when licensing its features to grant the license for each run at a reasonable clearance (if clearance is involved) to the highest bidder, if such bidder is responsible and has a theatre of a size, location, and equipment adequate to yield a reasonable return to the licensor. In other words, if two theatres are bidding and are fairly comparable, the one offering the best terms shall receive the license. Thus, price fixing among the licensors or between a licensor and its licensees as well as the non-competitive clearance system may be terminated."

We also said in Finding 111 that the granting of discriminatory license privileges would be impossible under such a system of competitive bidding as we have mentioned. In addition to providing a system of competitive bidding, we enjoined the unlawful practices above referred to, other than discrimination in granting licenses, which was sufficiently obviated by the provisions for competitive bidding.

In connection with the foregoing, we denied the application of the plaintiff to divest the major defendants of their theatres on the ground that such a remedy was too harsh and that the system of competitive bidding when coupled with the injunctive relief against the practices we found to be unlawful was adequate relief, at least until the efficiency of that system had been tried and found wanting. We held that the root of the lack of competition lay not in the ownership of many or most of the best theatres, but in the illegal practices of the defendants, which we believed would be obviated by the remedies we proposed. We examined the theatre holdings of the major

defendants, found that they aggregated only about 17% of all theatres in the United States, and held that these defendants by such theatre holdings alone did not collectively or individually have a monopoly of exhibition. While we did not find in express terms that there was no monopoly in first-run exhibition, we did review the statistics as to the first-run ownership in the 92 largest cities and stated in our opinion of June 11, 1946, that the defendants were not to be viewed collectively in determining the question of monopoly. See 66 F. Supp. 323, 354. We also found no substantial proof that any of the corporate defendants was organized or had been maintained for the purpose of achieving a national monopoly. Finding No. 152. Likewise, even as to localities where one defendant owned all first-run theatres, we found no sufficient proof of purpose to create a monopoly or that the total ownership in such places had not rather arisen from the inertness of competitors, their lack of financial ability to build comparable theatres, or from the preference of the public for the best equipped theatres. Finding No. 153.

In its opinion remanding the case for further consideration in certain respects, the Supreme Court affirmed our findings as to price-fixing, runs, clearances, and discriminatory licenses and other practices which we found to be unlawful, with certain minor reservations as to the unlawfulness of joint interests and franchises. It eliminated, however, the provisions of our decree for competitive bidding "so that a more effective decree may be fashioned," adding by way of caution that: "The competitive bidding system was perhaps the central arch of the decree designed by the District Court. Its elimination may effect the cases in ways other than those which we expressly mention. Hence on remand of the cases the freedom of the District Court to reconsider the adequacy of decree is not limited to those parts we have specifically indicated." 334 U.S. at page 166, 68 S.Ct. at page 933. It directed our further consideration of monopoly, divestiture and expansion of theatre holdings, giving as one reason the following: "As

we have seen, the District Court considered competitive bidding as an alternative to divestiture in the sense that it concluded that further consideration of divestiture should not be had until competitive bidding had been tried and found wanting. Since we eliminate from the decree the provisions for competitive bidding, it is necessary to set aside the findings on divestiture so that a new start on this phase of the cases may be made on their remand." 334 U.S. at page 175, 68 S.Ct. at page 937.

As further reasons for directing a reconsideration of the above issues, we were asked to determine whether the vertical integration of the major defendants, which was held not to be unlawful per se, was conceived with an intent to monopolize or was of such a character as to confer a known monopoly power. If the power be established, a specific intent to monopolize need not be shown. As was said by Justice Douglas in United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236, and referred to in United States v. Paramount Pictures, Inc., 334 U.S. 131, 173, 68 S.Ct. 915, 92 L.Ed. 1260: "It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the antitrust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements. United States v. Patten, 226 U.S. 525, 543, 33 S. Ct. 141, 145, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461. To require a greater showing would cripple the Act. As stated in United States v. Aluminum Co. of America, 2 Cir., 148 F. 2d 416, 432, 'no monopolist monopolizes unconscious of what he is doing.' Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by the Act."

In dealing with the effect of vertical integration upon monopoly, the opinion of the Supreme Court directs us to consider more explicitly than we did in our original opinion whether monopoly exists as to first-run theatres throughout the nation,

in the 92 largest cities, and in local situations.

It also directs us to determine whether there has been a geographic distribution of theatre ownership among the major defendants. The opinion also says: .

"It is clear, so far as the five majors are concerned, that the aim of the conspiracy was exclusionary, i.e. it was designed to strengthen their hold on the exhibition field. In other words, the conspiracy had monopoly in exhibition for one of its goals, as the District Court held. Price, clearance, and run are interdependent. The clearance and run provisions of the licenses fixed the relative playing positions of all theatres in a certain area; the minimum price provisions were based on playing position—the first-run theatres being required to charge the highest prices, the second-run theatres the next highest, and so on. As the District Court found, 'In effect, the distributor, by the fixing of minimum admission prices attempts to give the prior-run exhibitors as near a monopoly of the patronage as possible.'

"It is, therefore, not enough in determining the need for divestiture to conclude with the District Court that none of the defendants was organized or has been maintained for the purpose of achieving a 'national monopoly,' nor that the five majors through their present theatre holdings 'alone' do not and cannot collectively or individually have a monopoly of exhibition.' For when the starting point is a conspiracy to effect a monopoly through restraints of trade, it is relevant to determine what the results of the conspiracy were even if they fell short of monopoly." 334 U. S. at pages 170-171, 68 S.Ct. at page 935.

We were also directed to determine whether any "illegal fruits" were acquired or maintained by the defendants as results of unlawful conspiracies and to divest any such fruits, irrespective of whether monopoly had in fact been achieved. The plaintiff has not introduced evidence to support any claim of divestiture of "illegal fruits" and expressly reserves the presentation of such an issue for the future.

Because of the view of the Supreme Court as to matters to be specially considered on the remand as well as its view regarding other matters which it left open for consideration by this court, it set aside our findings on monopoly and divestiture and our provisions prohibiting further theatre expansion and our provisions for competitive bidding, in order that "the District Court should be allowed to make an entirely fresh start on the whole of the problem."

Although we previously held in Finding No. 154 that the illegalities and restraints were not in the ownership of theatres by the major defendants but in their unlawful practices, this finding was made because of our view that the competitive bidding system, when coupled with injunctions, would terminate the illegalities, and if such illegalities were terminated, the theatre ownerships alone would not be unlawful. This interpretation of our finding is justified by our former conclusion that divestiture should not be tried unless the competitive bidding system was found wanting. In other words, if theatre ownership were regarded as under no circumstances related to violations of the Sherman Act, divestiture could not be a proper remedy and would not have been suggested as a possible alternative in our former opinion.

Similarly, our Findings 152 and 153 that none of the defendants had been organized or maintained to achieve a national monopoly in production, distribution, or exhibition, or a local monopoly in first-run theatre ownership should be read in the light of the remedy we adopted. The provisions for competitive bidding were thought to have eliminated the conspiracies which had theretofore existed among the defendants in their capacities both as distributors and exhibitors and between defendants and independents, in which the defendants had cooperated and aided one another through certain illegal practices. We accordingly treated the defendants as no longer able to engage in illegal practices and the public sufficiently safeguarded by the requirement of competitive bidding and the injunctions against such practices. These safeguards we thought applied to the

national market as well as to local situations. Our conclusion of law that the defendants had attempted to monopolize was correct as to their prior acts, unaffected by our decree. And so the Supreme Court understood us to mean when it said: "In other words, the conspiracy had monopoly in exhibition for one of its goals, as the District Court held." 334 U. S. at page 170, 68 S.Ct. at page 935. With the elimination of competitive bidding, as we shall see from our future discussion, our Findings numbered 152 and 153 would not be justified, and should be vacated.

A review of the illegalities which we, and the Supreme Court as well, have found to exist, in addition to a consideration of geographical distribution and a very general absence of competition between the major defendants, convinces us that in the absence of a system of competitive bidding, the theatre holdings of the major defendants have played a vital part in effecting violations of the Sherman Anti-Trust Act.

We have held that all of the defendants fixed substantially the same price for each theatre in which they licensed their films. This system was general and affected most of the theatres in the United States. We likewise held that the system restricted competition between the theatres of the major defendants and those of independents. The system also plainly restricted competition between the theatres of the major defendants in those areas where such theatres were in competition with one another, since the minimum price to be charged by any theatre licensee was fixed and the licensee was prevented from competing in the business of exhibition by lowering his price. That these restrictions on competition were one of the primary objectives of the price-fixing conspiracy was noted in our former opinion, where we said that: "* * * all of the five major defendants had a definite interest in keeping up prices in any given territory in which they owned theatres, and this interest they were safeguarding by fixing minimum prices in their licenses when distributing their films to independent exhibitors in those areas. Even if the licenses were at a flat rate, a failure to require their licensees to maintain fixed prices would leave them free by lowering the current charge to decrease through competition the income in the licensors' own theatres in the neighborhood." 66 F.Supp. at pages 335-336.

In discussing the foregoing practices, Mr. Justice Douglas said in his opinion: "The District Court found that two price-fixing conspiracies existed—a horizontal one between all the defendants, a vertical one between each distributor-defendant and its licensees. The latter was based on express agreements and was plainly established. The former was inferred from the pattern of price-fixing disclosed in the record. We think there was adequate foundation for it too. It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement. Interstate Circuit v. United States, 306 U. S. 208, 226-227, 59 S.Ct. 467, 474, 83 L.Ed. 610; United States v. Masonite Corp., 316 U. S. 265, 275, 62 S.Ct. 1070, 1076, 86 L.Ed. 1461. That was shown here." 334 U. S. at page 142, 68 S.Ct. at page 922.

It seems obvious from the foregoing that complete freedom from price competition among theatre holders could only be obtained if prices were fixed by all distributors, and such a result was substantially obtained. Consequently, the system of theatre licensing had a vital and all-pervasive effect in restricting competition for theatre patronage.

In our Finding 72 we held that: "The differentials in admission price set by a distributor in licensing a particular feature in theatres exhibiting on different runs in the same competitive area are calculated to encourage as many patrons as possible to see the picture in the prior-run theatres" and thus the distributor "attempts to give the prior-run exhibitors as near a monopoly of the patronage as possible." This policy not only benefited the distributors in securing to them a maximum rental income from their films, but also benefited the major defendants as exhibitors, since they were

by far the largest owners of first-run theatres in the country.

The fixed system of runs and clearances which we found involved a cooperative arrangment among the defendants, was also designed to protect their theatre holdings and safeguard the revenue therefrom. Like the system of fixed prices, it could only succeed in eliminating competition if the defendants generally cooperated in maintaining it, as we have held they did. The major defendants' predominant position in first-run theatre holdings was strongly protected by a fixed system of clearances and runs. As we said in our former opinion: "The evidence we have referred to shows that both independent distributors and exhibitors when attempting to bargain with the defendants have been met by a fixed scale of clearances, runs, and admission prices to which they have been obliged to conform if they wished to get their pictures shown upon satisfactory runs or were to compete in exhibition either with the defendants' theatres or with theatres to which the latter have licensed their pictures. Under the circumstances disclosed in the record there has been no fair chance for either the present or any future licensees to change a situation sanctioned by such effective control and general acquiescence as have obtained." 66 F.Supp. at page 346.

Our view was confirmed by Mr. Justice Douglas as follows: "Clearances have been used along with price fixing to suppress competition with the theatres of the exhibitor-defendants and with other favored exhibitors." 334 U. S. 131, 148, 68 S.Ct. 915, 924.

While we pointed out in our former opinion that there was discrimination in clearance and run by distributors and theatre holders in particular instances, such as William Goldman Theatres v, Loew's Inc., 3 Cir., 150 F.2d 738, and Bigelow v. RKO Radio Pictures, Inc., 7 Cir., 150 F.2d 877, reversed on other grounds, 327 U. S. 251, 66 S.Ct. 574, 90 L.Ed. 652, we concluded that we could not say upon the facts before us that this discrimination was general. Nevertheless, as already stated, we held that the defendants had set up a system of fixed runs and clearances which prevented any effective competition by outsiders. This system, in the absence of competitive bidding which has now been rejected, gave the defendants a practical control over the run and clearance status of any given theatre and irrespective of the extent of local discriminations violated the Sherman Act. It involved discrimination against persons applying for licenses and seeking runs and clearances for their theatres, because they had no reasonable chance to improve their status by building or improving theatres while the major defendants possessed superior advantages. Therefore, though the evidence was insufficient to convince us that there was discrimination in negotiation for clearances and runs theatre by theatre, because it was well-nigh impossible to establish that a particular clearance or run was not refused because of the inadequacy of the applicant's theatre, the system of clearances and runs was such as to make competition against the defendants practically impossible.

As we have held, the licensing agreements in use by the defendants discriminated against small independents in favor of the larger circuits of affiliated and unaffiliated theatres. This discrimination was effected through formula deals and certain privileges frequently granted to large circuits in franchises and master agreements. They not only showed discrimination against small theatre owners, but in many instances also showed cooperation among the major defendants in their respective capacities as distributors and exhibitors. The minor defendants as distributors acceded to and cooperated with these restrictions, which excluded small independents.

Formula deals and certain master agreements, both of which involved licenses to more than one theatre, and frequently to affiliated or large independent circuits, permitted the exhibitor to allocate film rental and playing time and thus precluded other theatre owners from the opportunity of competing for films theatre by theatre. While the Supreme Court has said that franchises are not necessarily objectionable

per se, the defendants in various instances coupled their franchises with contract provisions which were not included in the standard forms of contract under which small independents were licensed. These provisions, which at times conferred great competitive advantages upon those receiving them, were: "Suspending the terms of a given contract, if a circuit theatre remains closed for more than eight weeks, and reinstating it without liability upon reopening; allowing large privileges in the selection and elimination of films; allowing deductions in film rentals if double bills are played; granting moveovers and extended runs; granting road show privileges; allowing overage and underage; granting unlimited playing time; excluding foreign pictures and those of independent producers; granting rights to question the classification of features for rental purposes." [Finding 110].

We have been instructed by the Supreme Court to consider the question of geographical distribution of theatres among the five major defendants. In dealing with this subject, we do not take into account the presence or absence of independent theatres in the areas dealt with. We have examined the defendants' theatre holdings and find that in cities of less than 100,000 in population, there is no doubt that Paramount, Warner, Fox and RKO owned or operated theatres either in largely separate market areas or in pools, without more than trifling competition among themselves or with Loew's. In cities having a population of more than 100,000, there was in general little competition among the defendants, although considerably more than in towns of under 100,000. A summary of the data which substantially represents the true situation, but owing to certain differences in the proofs offered must be regarded as approximate rather than as entirely accurate, is as follows:

Cities of less than 100,000.

In cities of less than 100,000, Paramount had complete or partial interests in or

pooling agreements* with other defendants affecting 1,236 theatres located in 494 towns. In 13 of these towns containing 31 of the theatres—or only 3%—there was competition with another defendant. In 9% of these towns competition between Paramount and the only other defendant in the town was substantially lessened or eliminated by means of a pooling agreement affecting some or all of their theatres; and in this 9% were located 10% of Paramount's theatre interests. And in 88% of the towns, containing 87% of Paramount's theatre interests, Paramount was the only defendant operating theatres. Thus it appears that there was little, if any, competition between Paramount and any other defendant in 97% of the towns of under 100,000 and in respect to 97% of the theatres in which Paramount had an interest.

Fox had similar theatre interests in 428 theatres located in 177 towns. In 13 of these towns containing 29 Fox theatres, or about 7% thereof, there was competition with another defendant. In about 93% of the towns containing the same percentage of Fox's theatre interests, Fox was the only defendant operating theatres.

Warner had similar theatre interests in 306 theatres located in 155 towns or less than 100,000. In 17 towns, or 11%, containing 30 Warner theatres, or 10% of its holdings, there was competition with another major defendant. In 3% of the towns, competition between Warner and the only other defendant in the town was substantially lessened or eliminated by means of pooling agreements; and in this 3% were located 4% of Warner's theatre interests. In 86% of the towns containing the same percentage of Warner's theatre interests, Warner was the only defendant operating theatres. Thus, there appears to have been little, if any, competition between Warner and any other defendant in 89% of the towns and in respect to 90% of the theatres in which Warner had an interest.

---

* Pooling agreements and joint interests among defendants are treated as indistinguishable for the purpose of summarizing geographical distribution.

Loew had interests in only 17 theatres located in 14 towns. In 4 towns, or 29%, containing 4 Loew theatres, or 23%, there was competition with another defendant. In 14% of the towns, competition was substantially lessened or eliminated by means of pooling agreements; and in this 14% were located 18% of Loew's theatre interests. In 57% of the towns, containing 59% of Loew's theatre interests, Loew was the only defendant operating theatres. Thus, there appears to have been little, if any, competition between Loew and any other defendant in 71% of the towns and in respect to 77% of the theatres in which Loew had an interest. It is to be noted, however, that Loew's theatre interests in towns of less than 100,000 constitute a far smaller proportion of its total theatre holdings than do those of the other defendants.

RKO had interests in 150 theatres located in 66 towns. In 6 towns, or 10%, containing 6 RKO theatres, or 4%, there was competition with another major defendant. In 60% of the towns, competition was substantially lessened or eliminated by means of pooling agreements, and in this 60% were located 73% of RKO's theatre interests. In 30% of the towns, containing 23% of RKO's theatre interests, RKO was the only defendant operating theatres. Thus, there appears to have been little, if any, competition between RKO and any other defendant in 90% of the towns and in respect to 96% of the theatres in which RKO had an interest.

As a further illustration of the absence of substantial competition among the five major defendants in towns of less than 100,000 population, the proofs as to their total theatre holdings make the following showing which seems to us impressive. They had interests altogether in 2,020 theatres located in 834 towns. In 26 towns, or 3%, containing 100 of their theatres, or 5%, there was competition among some of them. In somewhat over 5% of the towns competition between them was substantially lessened or eliminated by means of pooling agreements, and in this 5% were located 7% of their theatre interests. And in somewhat less than 92%

of the towns, containing 88% of their theatre interests, only one of the major defendants owned theatres in the area. Thus, there appears to have been little, if any, competition among the five defendants or any of them in 97% of the towns and in respect to 95% of the theatres in which they had an interest.

It appears from the foregoing that the effect of the geographical distribution in towns having a population of less than 100,000 was largely to eliminate competition among all of the defendants in the areas where any of them had theatres. The details upon which our results have been based appear in the statistical data set forth at the end of the opinion in Appendix 1.

### Cities of 100,000 and over.

In cities of over 100,000 Paramount had complete or partial interests in or pooling agreements with other defendants affecting 352 theatres in 49 cities. In 18 of these cities, or 37%, containing 91 Paramount theatres, or 26%, there was competition with other defendants. In an additional 10% of the cities containing 17% of Paramount's theatre holdings, there were other defendants having theatre interests, but those interests were so relatively small as compared with Paramount, both on first and later runs, that competition with Paramount was unsubstantial owing to the dominance which the latter's theatre holdings gave it. In 12% of these cities competition between Paramount and the only other defendants in the city was substantially lessened or eliminated by means of a pooling agreement affecting some or all of their theatres, and in this 12% were located 18% of Paramount's theatre interests. And in 41% of the cities, containing 39% of Paramount's theatre interests, Paramount was the only defendant operating theatres. Thus, it appears that there was little, if any, competition between Paramount and any other defendant in 63% of the cities of over 100,000 and in respect to 74% of the theatres in which Paramount had an interest.

Fox had similar theatre interests in 211 theatres located in 17 cities. In 5 of

these cities, or 29%, containing 54 Fox theatres, or 26%, there was competition with other defendants. In an additional 18% of the cities containing 41% of Fox's theatre holdings, there were other defendants having theatre interests, but those interests were so relatively small as compared with Fox, both on first and later runs, that competition with Fox was unsubstantial owing to the dominance which the latter's theatre holdings gave it. In 53% of the cities, containing 33% of Fox's theatre interests, Fox was the only defendant operating theatres. Thus, it appears that there was little, if any, competition between Fox and any other defendant in 71% of the cities and in respect to 74% of the theatres in which Fox had an interest.

Warner had similar theatre interests in 243 theatres located in 26 cities. In 14 of those cities, or 54%, containing 89 theatres, or 37%, there was competition with other defendants. In an additional 8% of the cities, containing 5% of Warner's theatre holdings, there were other defendants having theatre interests, but those interests were so relatively small as compared with Warner, both on first and later runs, that competition with Warner was unsubstantial owing to the dominance which the latter's theatre holdings gave it. In 19% of these cities competition between Warner and the only other defendants in the city was substantially lessened or eliminated by means of a pooling agreement affecting some or all of their theatres, and in this 19% were located 51% of Warner's theatre interests. And in 19% of the cities, containing 7% of Warner's theatre interests, Warner was the only defendant operating theatres. Thus, it appears that there was little, if any, competition between Warner and any other defendant in 46% of the cities and in respect to 63% of the theatres in which Warner had an interest.

Loew had similar theatre interests in 144 theatres located in 37 cities. In 32 of those cities, or 86%, containing 122 Loew theatres, or 85%, there was competition with other defendants. In 3% of these cities, competition between Loew and the only other defendant in the city was eliminated by means of a pooling agreement affecting all of their theatres, and in this 3% were located 7% of Loew's theatre interests. And in 11% of the cities, containing 8% of Loew's theatre interests, Loew was the only defendant operating theatres. Thus, it appears that there was little, if any, competition between Loew and any other defendant in 14% of the cities and in respect to 15% of the theatres in which Loew had an interest. In the matter of mere geographical distribution of its theatres, Loew has the most favorable record of any of the major defendants. But it is to be noted that, while it is true that as to its neighborhood prior run theatres in New York, there was competition with RKO in the sense that both operated in New York on the same runs, nevertheless these two companies divided the product of the various defendant distributors under a continuing arrangement so that there was no competition between them in obtaining pictures. Indeed, on one occasion where Paramount was having a long dispute with Loew's as to rental terms for Paramount films to be shown in Loew's New York neighborhood circuit of theatres, no attempt was made by Paramount to lease its films to RKO for exhibition in the latter's circuit, nor was any effort made by RKO to procure Paramount films as they both evidently preferred to adhere to the existing arrangement, under which Loew's circuit consistently exhibited the films of itself, Paramount, United Artists, Columbia and half of Universal, while RKO exhibited the films of itself, Fox, Warner, and half of Universal. Accordingly, we think that the showing that 85% of Loew's theatres are in competition with theatres of other defendants is misleading and may properly be reduced by the exclusion of its New York neighborhood theatres. If this is done, it would give Loew a percentage of approximately 42% of its theatres in competition with other defendants in cities over 100,000.

RKO had similar theatre interests in 256 theatres in 31 cities. In 22 of these cities, or 72%, containing 190 theatres, or 74%, there was competition with other defendants. In an additional 6% of the cities, containing 4% of RKO's theatre holdings,

there were other defendants having theatre interests, but those interests were so relatively small as compared with RKO, both on first and later runs, that competition with RKO was unsubstantial owing to the dominance which the latter's theatre holdings gave it. In 16% of these cities, competition between RKO and the only other defendants in the city was substantially lessened or eliminated by means of a pooling agreement affecting some or all of their theatres, and in this 16% were located 15% of RKO's theatre interests. And in 6% of the cities, containing 7% of RKO's theatre interests, RKO was the only defendant operating theatres. Thus, it appears that there was little, if any, competition between RKO and other defendants in 28% of the cities and in respect to 26% of the theatres in which RKO had an interest. With respect to mere geographical distribution, RKO's record was relatively good but it is to be noted that approximately 58% of its theatre interests were located in New York on neighborhood runs, and the same comments as to distribution of film made in regard to Loew's are applicable to RKO. If its New York neighborhood theatre interests were excluded from the category of theatres in competition with other defendants, the RKO percentage would then be only about 16% in competition with other defendants.

The major defendants had interests altogether in 1,112 theatres located in 87 cities of more than 100,000. In 46% of these cities, containing 23% of their theatre interests, only one of the major defendants owned theatres in the area. In 11.5% of the cities, competition between them was substantially lessened or eliminated by means of pooling agreements, and in this 11.5% were located 16% of their theatre holdings. In an additional 11.5% of the cities, containing 17% of their theatre interests, there was more than one defendant having theatre interests in the city, but the position of one defendant was so dominant relative to the others that competition between them was unsubstantial. In 31% of the cities, containing 44% of their theatre interests, there was competition among the defendants. But the New

York neighborhood theatres of Loew and RKO, which are included in reaching the 44% figure, should properly be excluded because there is no competition between Loew and RKO in obtaining pictures for the reasons we have already given. This would reduce the percentage of defendants' theatres which compete with one another to 27.

It appears from the foregoing that the effect of the geographical distribution in cities having a population of more than 100,000 was substantially to limit competition among the major defendants. The details upon which our results have been based appear in the statistical data set forth at the end of the opinion in Appendix 2.

The statistics contained in both Appendix 1 and Appendix 2 are derived from data submitted at the original trial and show the situation in 1945. Since the entry of our original decree, these figures have not been substantially changed as to towns of under 100,000, but have been somewhat changed, principally by the dissolution of pools pursuant to our decree, in the case of cities of more than 100,000. The situation in 1945, however, would seem to be far more important in determining whether violations of the Sherman Anti-Trust Act occurred than the status existing after the defendants had been found guilty of wrongs and were merely taking steps to carry out our remedial decree. For this reason, we have included statistics relating to the conduct of Paramount and RKO, even though the remedies against them are now provided under consent decrees.

The plaintiff contends that the figures as to geographical distribution require a finding that there was an agreement to divide territory, but the evidence indicates that much of the acquisition of theatres was due to the buying up of circuits and that the purchases at least in some of these cases involved competition among certain of the defendants. We, therefore, do not find an agreement to divide territory geographically in the organization of the defendants' theatre circuits, but we do hold that the geographical distribution became a part of a system in which competition was largely absent and

the status of which was maintained by fixed runs, clearances and prices, by pooling agreements and joint ownerships among the major defendants, and by cross-licensing which made it necessary that they should work together. The argument of some of the defendants that they had no opportunity to change this geographical status not only seems inherently improbable but affirmatively contradicted by the making of pooling agreements and entering into joint ownerships with one another. Moreover, even in the relatively few areas where more than one of the major defendants had theatres, competition for first-run licensing privileges was generally absent because the defendants customarily adhered to a set method in the distribution and playing of their films. In substantiation of the general picture, the plaintiff has shown, on the basis of a study of four seasons between the years 1936 and 1944, that during this period the privilege of first-run exhibition of a defendant's films was ordinarily transferred from one defendant to another only as the result of dissolution of a theatre operating pool or an arbitrary division of the product known as a "split". The lack of competition which we have described has undoubtedly been induced in large measure by the reliance of the defendants on each other in obtaining pictures for use in their various theatres throughout the country. The defendants were also dependent on one another to obtain theatre outlets for their own pictures, for the best customers of any defendant were ordinarily one or more of the other defendants.

We think that there can hardly be adequate competition among the defendants where such interdependence exists. Moreover, when the defendants were interdependent as to a great part of their activities, it necessarily would affect not only competition among themselves, but with independents. We have already found such effects in the various concerted practices of the defendants which have restricted competition with independents. In our former opinion, we provided for a system of competitive bidding for film in the belief that such a system would suffi-ciently control the reliance of the major defendants on one another's product and theatres. That system having been rejected by the Supreme Court, we must find some other means of preventing the major companies from being in a state of interdependence which too greatly restricts competition.

One of the chief matters referred to us by the Supreme Court is the effect of vertical integration upon competition in the industry. While vertical integration would not per se violate the Sherman Act, the Supreme Court has made it clear that if such integration is conceived with a specific intent to control the market or creates a power to control the market which is accompanied by an intent to exercise the power, the integration becomes illegal.

We are not satisfied that the plaintiff has shown a calculated scheme to control the market in the conception of the defendants' vertical integration, rather than a purpose to obtain an outlet for their pictures and a supply of film for their theatres. But here we are presented with a conspiracy among the defendants to fix prices, runs and clearances which we have already pointed out was powerfully aided by the system of vertical integration of each of the five major defendants. Such a situation has made the vertical integrations active aids to the conspiracy and has rendered them in this particular case illegal, however innocent they might be in other situations. We do not suggest that every vertically integrated company which engages in restraints of trade or conspiracies will thereby render its vertical integration illegal. The test is whether there is a close relationship between the vertical integration and the illegal practices. Here, the vertical integrations were a definite means of carrying out the restraints and conspiracies we have described. Moreover, we concluded in our prior findings, and the Supreme Court has affirmed our conclusion, that the distribution practices of the defendants constituted an attempt to obtain a monopoly in exhibition forbidden by the Sherman Act, a conclusion which requires the elimination of

our Findings 152 and 153, as explained above.

In respect to monopoly power, we think it existed in this case. As we have shown, the defendants were all working together. There was a horizontal conspiracy as to price-fixing, runs and clearances. The vertical integrations aided such a conspiracy at every point. In these circumstances, the defendants must be viewed collectively rather than independently as to the power which they exercised over the market by their theatre holdings. See American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. The statement in our former opinion that the defendants were to be treated individually is subject to our comments in dealing with Findings 152, 153 and 154. We were then proposing to set up a bidding system which was thought adequately to restore competition and, therefore, to render a treatment of the defendants in the aggregate as irrelevant. We regard such treatment as now necessary.

If viewed collectively, the major defendants owned in 1945 at least 70% of the first-run theatres in the 92 largest cities, and the Supreme Court has noted that they owned 60% of the first-run theatres in cities with populations between 25,000 and 100,000. As distributors, they received approximately 73% of the domestic film rental from the films, except Westerns, distributed in the 1943–44 season. These figures certainly indicate, when coupled with the strategic advantages of vertical integration, a power to exclude competition from these markets when desired. This power might be exercised either against non-affiliated exhibitors or distributors, for the ownership of what was generally the best first-run theatres, coupled with the possession by the defendants of the best pictures, enabled them substantially to control the market. If an intent to exercise the power be thought important, it existed in this case, as we noted above in finding an attempt to monopolize. Our former Finding No. 119 was not made in consideration of first-run theatres but was based on total theatre holdings in the country, of which the theatres owned by

the defendants represented but a small fraction. We, therefore, did not take into consideration the monopoly power in respect to first-run theatres, which we have since been directed to consider. Accordingly, our Finding No. 119 is in view of our further consideration misleading and must be vacated.

We may add that what we have said about the power to exclude independents from first-runs in the 92 cities is supported by evidence of actual exclusion which is presented in the Government's original brief, pages 13–14 and 35–40. In many cities, there was complete exclusion of independents and in numerous others a restricted distribution of pictures to independents, at times by only one of the defendants, and at other times by most limited percentages of pictures as compared with the number distributed to affiliated theatres. The facts as to film distribution in the 1943–44 season show that the five major defendants achieved a monopoly of first-run exhibition of the feature films distributed by the five major defendants in about 43 of the 92 cities of over 100,000 and of the feature films distributed by the eight defendants in about 143 of the 320 cities of 25,000 to 100,000. [See Government Exhibits 489, 490, 490(a)]. In addition to the proof of monopoly control in cities of more than 25,000, the plaintiff has produced proof that in approximately 238 towns involving in all but about 17 cases populations of less than 25,000 but having two or more theatres, some single one of the five major defendants, or in about 18 cases two of the defendants, had all the theatres and therefore possessed a complete local monopoly in exhibition. [See Government Exhibit 488]. These figures are subject to some qualifications because of inaccuracy as to a few localities, but for the most part they appear to be correct and to show either total absence of competition or slight competition from drive-ins and theatres in nearby communities. They afford significant additional proof of monopoly control. Accordingly, there was not only the power to exclude which might be exercised at will but an actual exclusion approximating in the aggregate 70% of

the first-run theatre market in the 92 largest cities. This percentage is based on the proportions of theatre ownership of the major defendants in these cities as compared with independents. There is certainly no reason to suppose that at least as great a percentage would not exist in favor of the major defendants in the number of feature films distributed on first-run.

Furthermore, the power to fix clearances and runs which we have found existed and was exercised by the major defendants was in itself a power to exclude independents who were competitors, and was accompanied by actual exclusion.

### The Remedy.

■ The Supreme Court has denied the remedy of requiring the defendants to offer films to the highest bidder and has required us to find some other means of obviating the illegal practices and attempted monopoly on the part of the defendants. The latter argue that the injunction issued in our prior decree, supplemented by a prohibition of discrimination against small independents and an adequate arbitration system, would afford a sufficient remedy. Mr. Justice Douglas has in this very case pointed out the inadequacies of an injunction to deal with situations much like the present. In discussing the objections to competitive bidding, he alluded to the fact that the determination of what was the best bid in a given case would depend on a comparison of the theatres and theatre operators desiring a picture, rentals offered, which might be a flat rental for one theatre and a percentage rental for another, and the relative value in respect to the various offers of the clearances and runs proposed. He said: "It would involve the judiciary in the administration of intricate and detailed rules governing priority, period of clearances, length of run, competitive areas, reasonable return, and the like." United States v. Paramount Pictures, Inc., 334 U.S. 131, 163, 68 S.Ct. 915, 932, 92 L. Ed. 1260. Practically all of the same objections would exist if an injunction should be relied on as the only remedy for the abuses which have been found to ex-

ist in the case at bar. The effect of such a solution would be to leave the determination of difficult comparisons to the discretion of the very parties who have frequently abused that discretion in the past, or to a detailed supervision by the courts, the burden of which would only be ameliorated by a system of arbitration if and in so far as particular independents having grievances might be willing to adopt it. If we had regarded an injunction as a sufficient remedy, we would not have required a competitive bidding for films in our original opinion.

In United States v. Crescent Amusement Co., 323 U.S. 173, 189–190, 65 S.Ct. 254, 262, 89 L.Ed. 160, Mr. Justice Douglas, in discussing the inadequacy of injunctions and the propriety of divestiture to prevent violations of the Sherman Act, said: "The fact that the companies were affiliated induced joint action and agreement. Common control was one of the instruments in bringing about unity of purpose and unity of action and in making the conspiracy effective. If that affiliation continues, there will be tempting opportunity for these exhibitors to continue to act in combination against the independents. The proclivity in the past to use that affiliation for an unlawful end warrants effective assurance that no such opportunity will be available in the future. Hence we do not think the District Court abused its discretion in failing to limit the relief to an injunction against future violations. There is no reason why the protection of the public interest should depend solely on that somewhat cumbersome procedure when another effective one is available."

In the Crescent case, the court accordingly affirmed an order of divestiture of stock held by the defendant companies to terminate affiliations and prevent further violations of the Act.

■ As an injunction is regarded as an insufficient remedy there must, in our opinion, be a divorcement or separation of the business of the defendants as exhibitors of films from their business as producers and distributors. Just as in the Crescent case affiliation was held to furnish the incentive

for carrying out the conspiracy that there existed, we find that vertical integration has served a similar purpose in the case at bar.

It is argued that the monopoly power which we have found existed in 1945 as to first-run theatres in the 92 largest cities has ceased to exist and that monopolies in particular localities have been substantially lessened in respect to Loew, Warner, and Fox, by the consent decrees recently entered against Paramount and RKO, by the dissolution of pools and joint interests which has taken place or will take place pursuant to our decree and by changes in distribution practices. Assuming that this is so, nevertheless, we have found that a conspiracy has been maintained through price-fixing, runs and clearances, induced by vertical integration, and that this conspiracy resulted in the exercise of monopoly power. The necessity of terminating such a conspiracy by the three defendants which have not subjected themselves to a consent decree would be unaffected by the present existence or non-existence of a monopoly on their part in first-runs, for the conspiracy is illegal even though the participants may have ceased at least for the time to possess monopoly power. Moreover, the monopoly power might be built up again if the illegal practices were not terminated by divorcement, irrespective of the fact that two of the conspirators have been eliminated from the conspiracy by the consent decrees. Therefore, the divorcement we have determined to order appears to be the only adequate means of terminating the conspiracy and preventing any resurgence of monopoly power on the part of the remaining defendants. Beyond all the above considerations there would seem to be an inherent injustice in allowing defendants to avoid divorcement when they would have been originally subjected to it merely because two of their confederates eliminated themselves from a compulsory decree which would have been based upon the participation of all in the conspiracy.

The defendants further contend that they have changed their distribution practices by arranging for many runs and clearances which are more equitable than before, and that they no longer have any participation in fixing the prices to be charged by a theatre licensee, which are now wholly controlled by the licensees. But the temptation to continue such practices will still be strong, and we cannot regard an injunction as a sufficient preventive for the reasons already stated. Likewise, we cannot know whether the new distribution practices comply with the injunctive provisions of our former decree and do not feel justified in leaving defendants found to be participants heretofore in improper practices free to continue them except for the inadequate injunctive provisions.

We have already held that our Findings 119, 152, 153 and 154 should be vacated. We also hold that Findings 155 and 156 should be vacated as they are incorrect or misleading in view of the elimination as a remedy of competitive bidding and our decision that injunctive relief alone is an insufficient remedy.

The plaintiff asks to have Finding 100 vacated and suggests a substitute. We hold that Finding 100 should be vacated because it is somewhat obscure in its scope and implications, but we do not find sufficient reason for adopting the proposed substitute, which seems to us to be irrelevant to the issues involved.

Since the Supreme Court has eliminated any system of competitive bidding, our Findings 85 and 111 should likewise be vacated.

### Joint Interests.

█ The Supreme Court has asked us to reconsider the dissolution of joint interests between defendants and independents because some partial interests of independents were said to have been held by investors rather than actual or potential exhibitors. Paramount and RKO need not be considered, since they are now subject to the provisions of consent decrees. Fox has obtained an order, agreed to by the plaintiff, dealing with the disposition of all its joint interests, except its partial ownership through its affiliate National Theatres Corporation in Evergreen State Amusement

Corporation. Fox contends that evidence offered at the trial after remand shows that one Newman, who had an indirect interest of about 15% in Evergreen, was not an actual or potential theatre operator. He became the president and manager of Evergreen, but that in itself did not make him a co-owner with Fox in that company, and his interest of about 15% seems to us no more than the interest of an investor. Nor do we find any indication that he would have been an independent operator of a theatre but for his investment in Evergreen. Prior to the investment he had been an employee of National and for some seven years had had no ownership in a theatre. In the circumstances, we hold that the interest of Fox in Evergreen need not be dissolved, although it will be subject to a general divorcement like the other theatre holdings of Fox from its distribution business.

In respect to Warner, the plaintiff has consented to an order disposing of all its joint interests. In the case of Loew, the plaintiff has agreed to an order disposing of its joint interest in Buffalo Theatres, Inc., and seems to have approved a stipulation made in open court providing for the disposition of all its other joint interests.

In our opinion the orders and stipulations relating to joint ownerships of Fox, Warner and Loew with independents are sufficient to dispose of all questions arising under the requirement of the Supreme Court that joint interests with actual or potential operators be dissolved. In view of the situation presented by the making of these orders and stipulations, our Findings 115, 116 and 117 should be vacated, and the proposed substituted findings of the plaintiff should be denied.

### Franchises.

■ We are directed by the Supreme Court to reconsider our prior decision prohibiting franchises in all cases, and as an initial step conforming to the Supreme Court's opinion our Finding 89 should be vacated. On reconsideration, we adhere to the view that the three remaining major defendants as well as the three minor de-

fendants should not be allowed to grant franchises except to independents. Such a practice ties up the distribution of films and restricts competition by independents to obtain pictures for what we regard as unnecessarily long periods and has been a method of unlawful discrimination in the past. We hold, however, that any of the defendants may grant franchises to an independent operator, provided that the result thereof will be to enable such independent to compete effectively with theatres affiliated with a defendant or with theatres in the new theatre circuits to be formed pursuant to our order of divorcement. We see no objection to the substituted Finding 89 proposed by the plaintiff and adopt it accordingly.

### Clearance.

■ Our disposition of clearances was in no way altered by the Supreme Court. We think, however, that our Finding 77 was inadvertent and should be modified so as to read as follows, thus conforming to paragraph 4 in Section II of our decree based upon the finding: "A grant of clearance, when not accompanied by a fixing of minimum admission prices or not unduly extended as to area or duration affords a fair protection of the interest of the licensee in the run granted without unreasonably interfering with the interest of the public."

The substitute for Finding 78 proposed by the plaintiff is denied.

### Discrimination.

■ The plaintiff requests cancellation of paragraphs 8 and 9 in Section II of our former decree, which include provisions as to discrimination, and wishes to substitute a flat prohibition against including in licenses made with affiliated exhibitors or circuits of theatres certain contract provisions by which discriminations against small independents and in favor of the large affiliated and unaffiliated circuits were accomplished, as this court stated in Finding 110, affirmed by the Supreme Court. These provisions would only be illegal if inherently discriminatory or used in a discriminatory manner. We think it sufficient to provide,

898

as was done in the Paramount consent decree, that the distributor defendants be enjoined "from licensing any feature for exhibition upon any run in any theatre in any other manner than that each license shall be offered and taken theatre by theatre, solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres, or others." It may be objected that this is competitive bidding which has been rejected by the Supreme Court, but it neither involves calling for bids nor licensing picture by picture. A group of pictures may be licensed to one who wishes to take them without conditions being imposed that he can obtain one only if he purchases the group. We hold that the request of the plaintiff for the cancellation of paragraph 8 of Section II of the decree should be granted, but paragraph 9 should stand as it is. A new paragraph corresponding with the one we have quoted above from the Paramount consent decree should be substituted for the cancelled paragraph 8.

### The Three Minor Defendants.

■ We can see nothing in the arguments on behalf of these defendants for special treatment except an attempt to revise some of our former findings of fact and conclusions of law which have been affirmed by the Supreme Court. We have already dealt with the questions of franchises and discrimination earlier in this opinion. In respect to road shows, we see no reason for exempting them from the various injunctive provisions of our decree. It is entirely possible for the licensor to license for road shows, so long as it is not done in a discriminatory manner, either at a flat rental or on the basis of some percentage of what the show is thought likely to yield. But it would be unlawful in this, as in the case of other licenses, for the licensor to require a fixed admission price as a condition of the license.

The three minor defendants argue that they should be allowed to retain their old customers irrespective of discrimination and contend that the Supreme Court has indicated that they possess this right. We cannot so interpret the opinion of the Supreme Court. It only presented the argument that, if competitive bidding had been sanctioned, the three minor defendants would lose the relationships they had with old customers and would be at a disadvantage in competing with the more powerful major defendants whose own theatres were not subject to competitive bidding. The system of preferring old customers undoubtedly aided discrimination in the past and served as a ready excuse for a fixed system of runs and clearances and was to that extent unlawful. When separation of the business of distribution from that of the operation of theatres is effected, there will be a favorable market for the three minor defendants in which to license their pictures. This will be not only a compensation for inability to prefer their old customers but apparently a substantial added advantage to them in obtaining a greater opportunity to license their pictures than they had heretofore.

### The Decree.

■ The Supreme Court has asked us to divest any theatres which may be fruits of past illegal restraints or conspiracies. It may appear also to be necessary, irrespective of our general plan of divorcement, to terminate theatre monopolies in certain local situations possessed by any individual defendant or by any new theatre circuit which may be set up under the divorcement decree we propose. The plaintiff has presented insufficient evidence to justify us in disestablishing particular theatres either on the theory of local monopolies or of illegal fruits, and indeed it has formally stated that evidence of illegal fruits is not now available. So far as local monopolies are concerned, the statistics presented by the plaintiff were furnished to support the need for a general divorcement which this opinion has sanctioned and did not precisely reach any situations of local monopoly which may require divestiture of specific theatres. Moreover, certain of the statistics presented by the plaintiff go no farther than the year 1945, and there have been various changes in theatre holdings since that date. Accordingly, consideration of fruits and local monopolies will be sus-

pended in the decree which we shall presently make.

In accordance with the instructions of the Supreme Court it is necessary that the provisions of paragraph 6 in Section III of our former decree in respect to expansion of theatre holdings be vacated. A provision should be substituted in the decree to be entered which enjoins the three exhibitor-defendants and any theatre-holding corporation resulting from the divorcement we propose from acquiring a beneficial interest in any additional theatre unless the acquiring exhibitor-defendant or corporation shall show to the satisfaction of the court, and the court shall first find, that such acquisition will not unduly restrain competition in the exhibition of feature motion pictures.

It is argued by the plaintiff that a limited prohibition of cross-licensing of pictures among the three major defendants should be adopted temporarily. We think such a limitation would be unwarrantedly injurious both to those defendants and to the public. The plaintiff proposes that each major defendant be enjoined from licensing more than half of its films to any of the other defendants pending the completion of divorcement plans in those towns where the plaintiff claims there are no independent theatres or at least no independent first-run theatres. The plaintiff evidently hopes that such a limitation would induce independents to acquire theatres in so-called closed towns. Unless and until that should happen, one or two of the major defendants might be unable to show more than half of their pictures in such towns, and if but one of the major defendants had theatres there, those theatres could show only half of the films of the other two. It is manifest that this limitation upon cross-licensing would injure both the major defendants and the public, who would be deprived of seeing some of the pictures. In addition to this, the selection of the particular pictures in the half which could be licensed would involve some difficulties and might prove in the end to have been unwise, both for the distributor involved and the public interest. Our remedy of divorce-

ment will meet all of the purposes for which the plaintiff is striving. We do not think that its completion will be so delayed as to justify this doubtful and difficult ad interim remedy proposed by the plaintiff.

The arbitration system and the Appeal Board which has been a part of it have been useful in the past and as we understand it have met with the general approval of the plaintiff and of those defendants who have agreed to it. In our opinion it has saved much litigation in the courts and it should be continued. Accordingly, the three major distributor-defendants and any others who are willing to file with the Amerian Arbitration Association their consent to abide by the rules of arbitration and to perform the awards of arbitrators, should be authorized to set up an arbitration system with an accompanying Appeal Board, which will become effective as soon as it may be organized after the decree to be entered in this action shall be made, upon terms to be settled by the court upon notice to the parties to this action.

The decree herein should be settled on notice and should be in accord with what we have said in the foregoing opinion. The terms as to divorcement set forth in the plaintiff's proposed decree seem to us satisfactory, except that the reference to paragraph 10 in Section III relating to joint interests, which we have rejected, should be deleted. We also approve of the further proposal of the plaintiff that the plaintiff and the defendants shall submit plans calling for such divestiture of theatres as may comply with the requirements of the Supreme Court regarding local monopolies and illegal fruits. Any ultimate disposition, however, must await a later order which shall be dependent upon the proof the plaintiff may furnish as to local monopolies and illegal fruits. We may perhaps indulge in the hope that the parties may be able to agree as to the disposition of any such interests, as they have done in the case of joint ownerships.

We do not approve of the provisions limiting cross-licensing pending the completion of divorcement or the provisions relating to dissolution of joint interests with

independents, which have been sufficiently provided for in stipulations of the three major defendants and the orders entered thereon to which we have made reference. Our opinion indicates other changes in the decree proposed by the plaintiff, which should be embodied in the amended decree.

We have specified former findings which should be vacated and in some instances have set forth proper substitutes. Further disposition of any findings to be made should await submission by the parties.

Submit proposed amended decree and findings on or before September 20, 1949.

### Appendix 1
### Summary of Theatre Holdings — Major Defendants
### Towns Under 100,000 — 1945

| | Paramount | | Fox | | Warner | | Loew | | RKO | | Total** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Towns | Theatres | Towns | Theatres | Towns | Theatres | Towns | Theatres | Towns | Theatres | Towns | Theatres |
| One deft. owns all affiliated theatres in the town | 438 (88%) | 1084 (87%) | 163 (92%) | 398 (93%) | 133 (86%) | 263 (88%) | 8 (57%) | 10 (59%) | 21 (30%) | 34 (23%) | 763 (91.5%) | 1789 (88%) |
| The defts. in the town are pooled as to some or all of their theatres | 43 (9%) | 6 / 115* (10%) | 1 (.5%) | 1* (...) | 5 (3%) | 5 / 8* (4%) | 2 (14%) | 1 / 2* (18%) | 39 (60%) | 2 / 108* (73%) | 45 (5.5%) | 14 / 117* (7%) |
| There is competition between defts. | 13 (3%) | 31 (3%) | 13 (7.5%) | 29 (7%) | 17 (11%) | 30 (10%) | 4 (29%) | 4 (23%) | 6 (10%) | 6 (4%) | 26 (3%) | 100 (5%) |
| Totals | 494 (100%) | 1121 / 115* (100%) | 177 (100%) | 427 / 1* (100%) | 155 (100%) | 298 / 8* (100%) | 14 (100%) | 15 / 2* (100%) | 66 (100%) | 42 / 108* (100%) | 834 (100%) | 1903 / 117* (100%) |

*These theatres were pooled by two defendants. Since each time a theatre was pooled there were two owners involved, the total number of pooled theatre interests was twice the number of theatres pooled. The term "pooled" is here used to include joint ownerships among defendants.

**The total number of towns is not necessarily the sum of the towns listed for each of the five defendants, since some towns have theatres owned by more than one individual defendant and such towns are therefore duplicated in the individual listings.

Appendix 2

## Summary of Theatre Holdings — Major Defendants
Towns Over 100,000 —1945

| | Paramount | | Fox | | Warner | | Loew | | RKO | | Totals*** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Towns | Theatres | Towns | Theatres | Towns | Theatres | Towns | Theatres | Towns | Theatres | Towns | Theatres |
| One deft. owns all affiliated theatres in town | 20 / 41% | 138 / 39% | 9 / 53% | 70 / 33% | 5 / 19% | 17 / 7% | 4 / 11% | 12 / 8% | 2 / 6% | 19 / 7% | 40 / 46% | 256 / 23% |
| The defts. in the town are pooled as to some or all of their theatres | 6 / 12% | 15 50* / 18% | — | — | 5 / 19% | 98 27* / 51% | 1 / 3% | 10* / 7% | 5 / 16% | 2 35* / 18% | 10 / 11.5% | 115 61* / 16% |
| Holdings of a deft. or pool which dominates affiliates in the town ** | 5 / 10% | 53 5* / 17% | 3 / 18% | 81 6* / 41% | 2 / 8% | 8 4* / 5% | — | — | 2 / 6% | 1 9* / 4% | 10 / 11.5% | 165 22* / 17% |
| Holdings in towns dominated by another deft. ** | 4 | 3 9* | 2 | 2 1* | 1 | 4 | 9 | 8 9* | 5 | 5 1* | | |
| Holdings where competition exists | 14 / 37% | 71 8* / 26% | 3 / 29% | 50 1* / 26% | 13 / 54% | 80 5* / 37% | 23 / 86% | 104 1* / 85% | 17 / 72% | 177 7* / 74% | 27 / 31% | 482 11* / 44% |
| Totals | 49 / 100% | 280 72* / 100% | 17 / 100% | 203 8* / 100% | 26 / 100% | 207 36* / 100% | 37 / 100% | 124 20* / 100% | 31 / 100% | 204 52* / 100% | 87 / 100% | 1018 94* / 100% |

*These theatres were pooled by two defendants. Since each time a theatre was pooled there were two owners involved, the total number of pooled theatre interests was twice the number of theatres pooled. The term "pooled" is here used to include joint ownerships among defendants.

**In arriving at an over-all total of theatres located in towns where one defendant dominated affiliated competition, the theatres of all defendants in such towns have been included because there exists no substantial competition among the defendants in any of them, but in considering records of individual defendants holdings in towns dominated by another defendant were treated as competitive. The ten towns designated as areas where one defendant or a pool dominates all other affiliates are: Atlanta, Cleveland, Denver, Detroit, Des Moines, Houston, Los Angeles, Paterson, Rochester and San Francisco.

***The total number of towns is not necessarily the sum of the towns listed for each of the five defendants, since some towns have theatres owned by more than one individual defendant and such towns are therefore duplicated in the individual listings.