**HOMEWOOD THEATRE, Inc. et al. v. LOEW'S, Inc. et al.**

Civ. 2698.

United States District Court
D. Minnesota, Fourth Division.

Sept. 2, 1952.

See also, D.C., 101 F.Supp. 76.

Lee Loevinger, Louise A. Herou and Larson, Loevinger, Lindquist, Freeman & Fraser, of Minneapolis, Minn., for plaintiff.

Joseph W. Finley, Mandt Torrison and Ronald S. Hazel, of St. Paul, Minn. (Bundlie, Kelley, Finley & Maun, of St. Paul, Minn., of counsel), for defendants Minnesota Amusement Co. and Paramount Pictures, Inc.

David Shearer, of Minneapolis, Minn. (Shearer, Byard, Trogner & Peters, of Minneapolis, Minn., of counsel), for the remaining defendants.

NORDBYE, Chief Judge.

This cause came before the court for trial without a jury.

Plaintiffs bring this action to recover damages under the Sherman and Clayton Acts, 15 U.S.C.A. §§ 1–7, 15 note, 12 et seq. They allege that these defendants have been engaged in a conspiracy on a national and local level to fix and control runs, clearances, and other terms upon which motion pictures are licensed to the exhibitors. Plaintiffs, during the period involved herein, operated the Homewood Theatre in North Minneapolis, and they contend that the impact of the conspiracy has caused them damages in the sum of $165,000.

The defendant Loew's, Inc., is commonly referred to as MGM. The Minnesota Amusement Company, sometimes referred to as M. A. C., from September 19, 1932, until the beginning of 1950, was a wholly owned subsidiary of Paramount. The Minnesota Amusement Company was the largest theatre exhibitor in Minnesota and operated both downtown and suburban theatres in Minneapolis. Its predecessor was the Publix Northwest Theatre Corporation, sometimes called Publix Northwest, also a wholly owned subsidiary of Paramount. The terms "Publix" and "Paramount Theatre" in the various exhibits refer to the theatres of the Minnesota Amusement Company or its predecessor. Paramount Pictures, Inc., is generally referred to as Paramount; RKO Radio Pictures, Inc., is known as RKO; Twentieth Century-Fox Film Corporation as Fox; Universal Film Exchanges, Inc., as Universal; Warner Bros. Pictures Distributing Corporation as Warner Bros., First National, Vitaphone, and Vitagraph. Each distributor has a branch exchange in Minneapolis with a resident manager. All motion picture licenses are submitted to the New York offices of the distributors for approval.

The Homewood Theatre is one of several suburban theatres in North Minneapolis. It has approximately 940 seats. During the times herein mentioned, it was, according to the evidence, superior to any theatre on the north side in appearance, appointments, facilities, and furnishings. It was operated by S. L. Lebedoff prior to 1928. From 1928 to 1930, it was operated by the American Amusement Company. In 1930, S. L. Lebedoff took over the operation of the theatre and since that time it has been operated by S. L. Lebedoff, Martin Lebedoff, his son, and the Homewood Theatre, Inc., a corporation, the latter being a corporation owned by the Lebedoffs. Immediately after 1930, the Homewood, when being operated by the Lebedoffs, ran on a 42, 49, and 56 day availability, with admission prices ranging from 20 to 30 cents. Generally, it may be stated that at that time Homewood was accorded by the distributors either the first run on the north side or equal availability with the other north side theatres charging the same admission price. The Paradise Theatre was Homewood's nearest competitor and was within walking distance.

At or about 1930, there was apparently no uniformity among the distributors of motion pictures in the granting of clearance to first run theatres over subsequent run theatres in Minneapolis. As one of the branch managers of one of the defendant distributors expressed it, "Well, conditions were more or less chaotic. There wasn't any order in the playing position of any theatre. * * * Well, one theatre would buy product for a certain place—a certain price and perhaps play 14 days after downtown. Some other important theatre would buy product and pay a much higher price and maybe play it six weeks after downtown. Then some other theatre would buy and pay a good price and play four weeks after downtown." (Record, p. 2924).

This system apparently caused dissatisfaction among the distributors as well as the exhibitors, and steps were taken to remedy the situation. There was in existence at this time in Minneapolis, and had been for some years, the Minneapolis Film Board of Trade. This organization was composed of the branch managers of each of the distributors located in Minneapolis. Their membership was obligatory, and the organization, with a paid secretary, was maintained by the national organization of motion picture producers in New York.

At or about this time, Publix Northwest Theatres, a Paramount subsidiary, made a proposal to the Minneapolis Film Board of Trade for the consideration of a zoning plan in order to work out some feasible system of runs and clearances. At the instance of Mr. Workman, branch manager of Loew's, and president of the Film Board of Trade, a meeting was called which was attended by the representatives of Paramount Publix theatres, the members of the Film Board of Trade, and the representatives of certain independent exhibitors. It appears that, as an outgrowth of this meeting, a zoning plan for the City of Minneapolis was agreed upon "in principle" (Record, p. 2975) as between the several distributors and the so-called circuit theatres operated by the Publix Northwest Theatres Corporation. The independent theatres' representatives, however, did not agree to the proposed plan, and while it does not appear from the evidence that any formal arrangement or agreement as to zoning, runs and clearances was adopted by the Film Board of Trade and Publix Northwest Theatres, the evidence is very persuasive, if not conclusive, that the agreement "in principle" among the distributors and Publix Northwest shortly thereafter evolved into a uniform plan or system for clearances with Publix Northwest, and later its successor, Minnesota Amusement Company, with the city being divided into seven zones. In September, 1932, the Minnesota Amusement Company was incorporated and apparently carried on from that date the motion picture exhibition of Paramount in the Minnesota territory.

That after 1930 there was substantial uniformity among all the defendant distributors in following a patterned plan and system of runs and clearances and availabilities in Minneapolis seems uncontradicted. Primarily, it was bottomed upon the admission price charged by the particular theatre, with the theatres affiliated with the major distributors usually being accorded the first run and certain Minnesota Amusement Company suburban theatres being granted an availability of 7 days earlier than independent houses charging the same price.

At or about the time the distributors began to follow their schedule of runs and clearances in Minneapolis, and in September, 1932, the Peoples Theatre Company filed its bill in equity against the Minneapolis Film Board of Trade and certain major distributors, including the defendant distributors herein, or their predecessors. In that suit, plaintiff charged that the defendants were engaged in a conspiracy in undue and unreasonable restraint of trade in violation of the Sherman Anti-Trust Act, and, among other things, charged that the defendants conspired to grant Publix Northwest Theatre Corporation a monopoly of the business in exhibiting pictures to the public in the so-called Film Board territory by

"(a) Granting to said Northwest Company special preferences and privileges in the selection, leasing and exhibition of motion pictures not accorded to other theatre owners and operators;

"(b) Denying to theatre owners and operators other than said Northwest Company the right to select, lease and exhibit motion pictures upon terms and conditions which will enable them to compete with the theatres of said Northwest Company or to retain the patronage to which they are accustomed and which they must have to remain in business;

"(c) Refusing to furnish to such other theatre owners and operators motion pictures until such time has elapsed after the showing of such pictures in

the houses controlled by said Northwest Company that the pictures have largely lost their novelty and freshness and consequently their attractiveness to the public;

"(d) Regulating the playing time of such other theatres after the pictures have been shown in the theatres of said Northwest Company according to the admission prices charged by said other theatres, thus protecting the theatres of the Northwest Company against all price competition and effecting a general increase in admission prices in said Minneapolis Film Board Territory."

The Peoples Theatre Company operated the Paradise Theatre in North Minneapolis, and the gravamen of its complaint was:

"As a result of said combination and conspiracy, and of the acts and things done in pursuance thereof, petitioner has been put so far behind the theatres of the Northwest Company in playing time, and has been so interfered with and harrassed in the conduct of its business, and has been subjected to such unreasonable and oppressive discriminations and disadvantages in obtaining an adequate supply of suitable motion pictures, that it has suffered losses and injury in its business; * * *."

Issue was joined in that proceeding and notice of trial was served on February 27, 1933. It appears that one W. A. Steffes was a leading figure in the independent theatres' organization at that time. He was the operator of the Paradise Theatre and president of the Peoples Theatre Company. Early in 1933, while the Peoples Theatre suit was pending, Paradise was playing on a 15 cent admission and had one of the later runs in North Minneapolis.

During this period when the Peoples Theatre suit was pending, and on November 13, 1933, Paramount granted Paradise the first run on the north side provided that the admission price was 25 cents for adults. (Plaintiffs' Exhibit 252). There is evidence in a memorandum executed by a local Paramount branch manager

(Plaintiffs' Exhibit 254) under the same date as this license was granted, to wit, November 13, 1933, which was directed to the head office of Paramount, with reference to the acceleration of Paradise's playing position on the north side, to the effect that "We feel it is good business * * * to move him [Steffes] up to a higher admission price spot as it will help the whole vicinity."

On December 8, 1933, Loew's gave Paradise a 56 day run (Loew's Exhibit 11). In March of 1934 it appears that one Benjamin Berger went into partnership with Steffes in the operation of the Paradise Theatre, and on or about March 11, 1934, the North Amusement Company, primarily consisting of Steffes and Berger, took over the operation of the Paradise, and the Peoples Theatre Company apparently transferred its interest in Paradise to that corporation at or about that time. Berger was called as a witness for the plaintiffs in this trial, and in explaining the obtaining of a preferred run for Paradise from Loew's, Warners and Paramount, he testified, "I offered a possible lawsuit for discrimination, discriminating my theatre since I requested a run of the same type that has been established in the community by the circuit operating theatres." (Record, p. 900).

On or about July 31, 1934, Warner Bros. granted Paradise the first 20 cent run on the north side. (Warners' Exhibit 37). On September 18, 1934, Loew's granted Paradise the first run in North Minneapolis, with clearance over Homewood. (Loew's Exhibit 11). In January, 1935, Paramount executed a contract granting Paradise first run on the north side with the provision that the run should continue as long as its admission price was greater than, or equal to, the other competitive houses in that district. (Plaintiffs' Exhibit 255).

It would appear that, during the time the Paradise Theatre was obtaining a better playing position on the north side, Homewood was apprised of the situation because on October 18, 1934, it signed an application with a Paramount agent calling for Homewood to play pictures ahead of

Paradise. (Plaintiffs' Exhibit 296). However, when that contract was forwarded by the agent to the home office in New York, it was not approved.

On July 5, 1934, by virtue of a stipulation dated June 26, 1934, the Peoples Theatre suit was dismissed by the court as to Paramount and Publix Northwest Theatre Corporation, and on November 8, 1934, by order of court, pursuant to a stipulation of November 5, 1934, the action was dismissed as to the remaining defendants.

Following the dismissal of the Peoples Theatre suit, and from 1935 until 1938, Paradise, with a few exceptions, was accorded the first run on the north side by all of the defendant distributors during the seasons when they licensed pictures to that theatre. And from 1938 to 1948, Paradise was the only independent theatre in Minneapolis accorded a so-called 49 day circuit run, which run was granted to certain of the M.A.C. suburban theatres. In receiving this consideration of the first run on the north side, however, the film rental thereafter paid by the Paradise substantially exceeded that paid by Homewood and the other north side theatres. The Lebedoffs contend that they complained bitterly from time to time to various representatives of the defendant distributors during the periods from 1934 to September 16, 1948, that "their run" on the north side had been taken away from them by Paradise. They contend that they agreed to equal or exceed the film rental paid by Paradise, but it is their position that, although they made repeated protests and requests in this regard throughout the years, they were unable to obtain any satisfaction from any of the distributors. They contend that on occasions when they complained and endeavored to obtain a better playing position they were told that they could thank their leader, Mr. Steffes, for the situation that existed on the north side. And at other times they contend that they were told that the run granted to Paradise was fixed and established by those higher in authority, and that nothing could be done by the local representatives of the defendant distributors to whom they complained.

The defendant distributors, however, deny that the Lebedoffs were complaining about their run after 1934. And it is their position that a run equal or better than that accorded to Paradise would have been granted to Homewood if the Lebedoffs had been willing to pay the necessary film rental. They contend that Homewood had no vested right in the first run on the north side; that the distributors had concluded that Paradise had better box-office grossing potentialities, and therefore when Paradise in 1934 and thereafter agreed to pay the higher film rental and one which justified a prior playing position on the north side, such priority was accorded to it through the individual dealings of each distributor. And defendants point out that there was a signal lack of uniformity in the dealings of the various distributors with Paradise; that while Warners, Loew's, and Paramount in 1934 granted Paradise the first run on the north side, Fox did not sell to Paradise until 1943, and that Universal did not sell to Paradise until 1941. Moreover, it is pointed out that RKO dealings with Paradise were irregular and without any uniformity. And defendants urge that the apparent uniformity with which some of the defendant distributors followed Loew's, Warners and Paramount with respect to Paradise's run, does not indicate that there was any concert of action or any agreement among the distributors to accord Paradise the preferred run. Rather, it is urged that any motion picture exhibitor must have an even flow of pictures; that when one or more of the distributors grant an exhibitor a certain run, other distributors are unable to make any contracts which do not accord such exhibitor the same run. It is pointed out that an even flow of pictures is necessary for the exhibitor to function successfully. But, in this connection, it is without contradiction that between 1934 and September 16, 1948, Homewood did not obtain a run over Paradise, with possibly a few exceptions, during any season from any defendant distributor when such distributor was doing business with Paradise. There was a hiatus in the dealings between some of the distributors and Para-

dise, when the latter for one reason or another refused to buy pictures from them. Under those circumstances, if Homewood was willing to obtain pictures from such distributors, they were released clear of Paradise. But when in subsequent years such distributors resumed business dealings with Paradise, it inevitably followed that Paradise obtained the preferred run. Moreover, after 1938, when Paradise procured the 49 day run, every defendant distributor (except RKO for one or more brief periods) accorded Paradise a 49 day playing position after the first run when contracting for pictures. That run was commonly referred to by all distributors as the "circuit run". The only other theatres granted this run were the Arion, the Granada, and the Rialto, all of which were M.A.C. suburban theatres. The runs granted by the distributors to these suburban M.A.C. houses were generally referred to in the various licenses and other booking records of the defendant distributors kept in connection therewith as "Public break" or "usual Publix protection plan" or "usual" or "regular", all to indicate the uniform plan of clearance established as between the distributors and the Minnesota Amusement Company. On some of the earlier licenses granted to M.A.C. theatres, the preferred runs granted to them were noted as "ours" on the prepared schedule of runs and clearances, while the later runs to independent theatres were designated as "others". The pattern of runs and clearances was not always followed with literal regularity, but the arrangement and scheme for runs and clearances which continued from 1933 to September 16, 1948, inclusive, was substantially followed. There may have been some flexibility in certain instances where special clearances were granted with the consent of the circuit theatres. But with a few exceptions it was inflexible so far as the preference granted to the M.A.C. theatres and Paradise was concerned. There are isolated records which have entries which may seem to reflect the same availability for both Paradise and Homewood; in actuality, however, Homewood was required to run at least 7 days after Paradise if both theatres were charging the same admission price.

As indicative of the recognition by the defendant distributors that Paradise was being granted a circuit run, reference may be made to the RKO cut-off cards from 1942 to 1948, the cut-off cards being a booking record, which among other things were used to indicate the runs accorded to any particular theatre. On these cards the availability of Paradise was noted as being a "Publix break". (Plaintiffs' Exhibits 349 to 354, incl.)

Plaintiffs' position is that they lost the opportunity to compete with Paradise for a first run on the north side as the direct result of the conspiracy between the distributors and the M.A.C. to establish a uniform system of runs, clearances, and availabilities in Minneapolis based primarily upon the admission price, with certain preferences in runs and clearances to the M.A.C. theatres. And they contend that the defendants' plan and system in this regard being under attack by Steffes in the Peoples Theatre suit and by Berger, who bought into the Paradise operations—both Steffes and Berger being leaders in the so-called independent theatres' association —caused the defendants to capitulate to the demands of Steffes and Berger and to modify their system of runs and clearances accordingly, with a preference to Paradise, in an attempt to maintain their conspiratorial system from legal attack. In other words, plaintiffs contend that the preferred playing position of Paradise was the price paid for the dismissal of the Peoples Theatre suit. Defendants, on the other hand, contend that the change as to the playing positions of Homewood and Paradise was merely the result of the exercise of good business judgment on the part of the individual defendant distributors which from time to time licensed pictures to Paradise and which accorded to that theatre a playing position which the film rentals justified. They deny that the dismissal of the Peoples Theatre suit had any connection with the preferred playing position granted to Paradise, and they point out that, when that suit was dismissed, Peoples Theatre Company was no longer operating

the Paradise and therefore could not continue as a party plaintiff to a suit in equity brought under the anti-trust laws.

■ It is recognized by all courts which have considered the question that there is nothing inherently illegal in the maintenance of runs and clearances in license contracts in the licensing of motion pictures to theatre exhibitors. As the court stated in United States v. Paramount, D.C., 66 F.Supp. 323, 341,

"* * * Such provisions are no more than safeguards against concurrent or subsequent licenses in the same area until the exhibitor whose theatre is involved has had a chance to exhibit the pictures licensed without invasion by a subsequent exhibitor at a lower price. It seems nothing more than an adoption of the common·law rule to restrict subsequent exhibitions for a reasonable time within a reasonable area. While clearance may indirectly affect admission prices, it does not fix them and is, we believe, a reasonable restraint permitted by the Sherman Act."

And on pages 342–43 of 66 F.Supp.,

"* * * A distributor will naturally tend to grant a subsequent run to and clearance over a theatre for which the owner of his own volition sets a low admission price, for the distributor will be inclined to seek out the higher priced theatres first where the revenue is likely to be greater and consequently in case of licenses on a percentage basis where a percentage share will be higher. This, however, would seem the inevitable result of the competition for the distributor's films from theatres which are the larger or better equipped, and for which higher admission prices may therefore be charged by their operators. Such competition the lower priced theatres must be prepared to meet, or else be content with subsequent runs and grants of clearance over them. * * *

"In determining whether any clearance complained of is unreasonable, the following factors should be taken into consideration and accorded the importance and weight to which each is entitled, regardless of the order in which they are listed:

"(1) The admission prices, as set by the exhibitors, of the theatres involved;

"(2) The character and location of the theatres involved, including size, type of entertainment, appointments, transit facilities, etc.;

"(3) The policy of operation of the theatres involved, such as the showing of double features, gift nights, giveaways, premiums, cut-rate tickets, lotteries, etc.;

"(4) The rental terms and license fees paid by the theatres involved and the revenues derived by the distributor-defendant from such theatres;

"(5) The extent to which the theatres involved compete with each other for patronage;

"(6) The fact that a theatre involved is affiliated with a defendant-distributor or with an independent circuit of theatres should be disregarded; and

"(7) There should be no clearance between theatres not in substantial competition."

But in commenting upon these factors which should be taken into consideration in determining the reasonableness of clearances, the expediting court made the following statement, 66 F.Supp. at page 343,

"The foregoing has been directed to the validity of clearance provisions resulting from separate negotiations between individual distributors and exhibitors in free and open competition with other distributors and exhibitors, and, as stated, we believe their reasonable use to be lawful. It is here claimed by plaintiff, however, that the distributor-defendants have acted in concert in the formation of a uniform system of clearances for the theatres to which they license their films and that the exhibitor-defendants have assisted in creating and have acquiesced in this sys-

tem. This we find to be the case and hold to be in violation of the Sherman Act."

An impartial consideration of the record here not only amply justifies, but requires, a finding that the defendants acted in concert in the establishment of a uniform system of runs and clearances in the licensing of motion pictures to the various motion picture houses in the City of Minneapolis, and one of the purposes of the establishment of uniformity and the acting in concert in the formation of a system of runs and clearances was to grant the local M.A.C. theatres a preferred position in runs and clearances. Such action presumably was prompted by the fact that the M.A.C. was the largest circuit exhibitor of motion pictures in this area and thus the source of a large revenue to the distributors. The admission price was an important, if not the most important, factor in determining the position of any exhibitor in the ladder of runs and clearances. Almost without exception, if the admission price of any theatre was lowered, the particular theatre was required to occupy a lower rung on this ladder, and this would be true regardless of the fact that the theatre in the meantime maintained the same appointments, facilities and conveniences for its patrons. The elevation of the Paradise, a 15 cent admission theatre, at least somewhat inferior in appointments, facilities, and size to the Homewood, to the first run on the north side was not the result of separate negotiations by the individual distributors in free and open competition with the other theatres on the north side, but was a capitulation to the demands of two influential independent operators who threatened the very system which gave birth to Paradise's preferred position. Granted that there are instances in the record which may seem to negative the finding of any understanding as to an inflexible prior run to Paradise, particularly when this theatre was not obtaining pictures from a particular distributor, these exceptions do not constitute persuasive evidence against the overwhelming showing which surely and convincingly points to a tacit understanding, at least, among the distributors as to the system of runs and clearances which should be followed and Paradise's status in that system. The following observations are fully sustained by the evidence:

1. There was no past showing in the grossing potentialities of Paradise, a 15 cent admission theatre, prior to 1934, which would justify an assumption that it was entitled to a first run on the north side from the viewpoint of the amount of revenue which thereby would be available for the distributors. The gross earnings of Homewood in 1934 amounted to $34,101.32, while the gross earnings of Paradise for that year totaled $26,760.05.

2. The gravamen of the suit instituted by Steffes against the distributors in the name of the Peoples Theatre Company was the alleged discrimination by the defendant distributors in favor of the Publix Theatres to the detriment of the Paradise Theatre, and upon receiving the first run for Paradise on the north side and placing the Paradise on a par with the preferences granted certain circuit theatres, the Steffes suit was dismissed. The fact that Peoples Theatre Company apparently assigned its interest in Paradise to North Amusement Co. before or about the time of the dismissal of the suit is of no particular significance in view of all the circumstances. The Peoples Theatre Company was W. L. Steffes—the North Amusement Co. was Steffes and Berger.

3. While there is a marked dispute in the testimony and although some of the Lebedoffs' testimony is of questionable dependability, the evidence is fairly convincing that, from time to time and on numerous occasions, the Lebedoffs did complain to the various distributors with reference to the runs of Homewood after 1934 and that they attempted on many, many occasions to enter into separate negotiations with various defendant distributors for a better run, but without any success.

4. From 1935 to September 16, 1948, inclusive, except for certain periods during the booking seasons when any particular defendant distributor was not dealing with Paradise, the latter, with a few exceptions, was always accorded by the distributors a prior run over Homewood at the same ad-

408

mission price. If Homewood lowered its price to meet Paradise's competition, then the schedule of runs and clearances followed by the distributors relegated it to a still later run.

5. The only independent theatre in Minneapolis which received a 49 day run from 1938 to September 16, 1948, inclusive, from any of the defendant distributors was the Paradise. The only other theatres in Minneapolis which were accorded a 49 day run between these years were certain Minnesota Amusement Company theatres.

6. The Minnesota Amusement Company, the principal benefactor of the concerted plan, from time to time mimeographed the agreed schedule of runs and clearances for the convenience of the defendant distributors and in various ways aided and assisted the distributors in maintaining the plan of runs and clearances.

7. Whenever a theatre exhibitor lowered his admission price, that generally, without more, relegated him to a later run in the schedule of runs and clearances followed by the distributors, and this remained true throughout, although his appointments and facilities, etc., remained constant.

8. The system of runs and clearances herein generally conforms to that described in the opinion of the Supreme Court in United States v. Paramount, 334 U.S. 131, 144-45, 68 S.Ct. 915, 92 L.Ed. 1260.

"* * * The District Court found that all of the distributor-defendants used clearance provisions and that they were stated in several different ways or in combinations: in terms of a given period between designated runs; in terms of admission prices charged by competing theatres; in terms of a given period of clearance over specifically named theatres; in terms of so many days' clearance over specified areas or towns; * * *."

██ The court has no difficulty, therefore, in finding from the evidence that defendants combined and conspired to establish, and did establish, a uniform system of runs and clearances in Minneapolis and that this system denied plaintiffs a free market in which to deal; that as an out-

growth of that system, and as an integral part thereof, the distributor defendants maintained an unreasonable clearance over Homewood in favor of the Paradise Theatre. Obviously, Homewood had no vested right to the first run on the north side, and the mere fact that it had had a run over or equal to Paradise prior to 1934 does not mean that the distributors had to continue that allocation indefinitely, but Homewood did have the right to compete for the first run or any other run on the north side free from any unreasonable curtailment by a conspiracy of the defendants in restraint of such right of trade.

The system of runs and clearances which was condemned in the Paramount cases had its counterpart on a local level in the City of Minneapolis. Defendants' contention that at any time during these years Homewood could have obtained a better run in the event it had been willing to pay the price by way of a higher percentage on the gross of its pictures as rental is devoid of any convincing support in the evidence. From 1935 to September 16, 1948, inclusive, Homewood was in a "slot" as to availability for motion pictures from the defendant distributors which was subsequent to the position allocated to Paradise when they were dealing with that theatre, and all of plaintiffs' protestations and attempts to better their playing position were futile in that regard. The court is not unmindful of the difficulty confronting distributors in determining the question of runs and clearances. No doubt there may be uniformity in runs and clearances granted to a theatre by the various distributors without any concert of action to that end. There is substance to defendants' position that it is desirable for a theatre to have an even flow of pictures from the distributors with which it deals, and not have pictures released to it on widely staggered availabilities. Moreover, when a theatre obtains a prescribed run from 3 or 4 major distributors, the other distributors usually are required to fall in line because the particular theatre insists on the same run from all the distributors with which it deals. But Paradise's playing position during the years in question was not the outgrowth of individ-

ual negotiations between the distributors and Paradise after a consideration of the relevant factors which the court outlined in United States v. Paramount, supra, as determinative of the reasonableness of clearances. The uniformity as to runs and clearances followed by the distributors as to Paradise was the outgrowth of an attempt of the distributors to safeguard and maintain their system of runs and clearances from legal attack. While it is not necessary for this court in this case to determine whether or not the system of runs and clearances during the years in question in Minneapolis constituted in actuality a fixing of admission prices of the theatres by the distributors, it is evident that, as heretofore stated, the admission price was largely the controlling factor which determined the particular runs which would be allocated to any certain theatre. The penalty of a change in admission price was the allocation of a later run. The court does conclude, however, that the system of runs and clearances which existed in this city during the period in question was adopted by a concert of action of the defendant distributors, that it was unreasonable, and that it runs afoul of the Sherman Act.

■ Plaintiffs have introduced the final decrees in the cases of United States v. Paramount, D. C., 66 F.Supp. 323, Id., D. C., 70 F.Supp. 53, and Id., D.C., 85 F.Supp. 881, and United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The pertinent documents have been identified as Plaintiffs' Exhibits 339 to 344, inclusive. The evidence was offered as prima facie evidence against the defendants under 15 U.S.C.A. § 16. There can be no serious controversy as to the admission of the final decrees as to the defendants Loew's, Fox, Warners, and Universal. Obviously, the court must make reference to the findings of the statutory court and other pertinent proceedings therein in order to determine the effect of the final decrees. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 569, 71 S.Ct. 408, 95 L.Ed. 534. It is apparent from the findings in the Paramount cases that there was found to be in existence a uniform system

of runs and clearances created by a concert of action of the distributor defendants in violation of the Sherman Act. The national system of runs and clearances condemned in the Paramount cases had its counterpart here in a local phase. The Minnesota Amusement Company, as an affiliate of Paramount, knowingly aided and assisted in, and was a part of the system which the distributors formulated and was a recipient of the preferential runs and clearances adopted thereunder.

Paramount and RKO urge, however, that the decrees as to them are consent decrees and hence are inadmissible under the provisions of Section 16, Title 15, U.S.C.A., which reads, in part,

"A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, This section shall not apply to consent judgments or decrees entered before any testimony has been taken."

■ The original decree entered by the expediting court before the appeal to the Supreme Court was not, of course, a consent decree. Both Paramount and RKO, as well as the other defendants, challenged the Government's contention that there was any conspiracy as alleged. There was an extended trial, and in the decree of February 3, 1947, all the defendants, including Paramount and RKO, were, among other things, enjoined

"2. From agreeing with each other or with any exhibitors or distributors to maintain a system of clearances; the term 'clearances' as used herein meaning the period of time stipulated in license contracts which must elapse between runs of the same features

within a particular area or in specified theatres.

"3. From granting any clearance between theatres not in substantial competition.

"4. From granting or enforcing any clearance against theatres in substantial competition with the theatre receiving the license for exhibition in excess of what is reasonably necessary to protect the licensee in the run granted. Whenever any clearance provision is attacked as not legal under the provisions of this decree, the burden shall be upon the distributor to sustain the legality thereof." D.C., 70 F.Supp. 53, 73.

From this decree, an appeal was taken by all of the defendants to the Supreme Court of the United States, which affirmed the findings of the District Court as to runs and clearances, but remanded the case for the consideration of the provision of the decree as to competitive bidding, and as to other particulars not here important. When the matter was before the expediting court on remand, the court specifically found, D.C., 85 F.Supp. 881, 885, that "In its opinion remanding the case for further consideration in certain respects, the Supreme Court affirmed our findings as to price-fixing, runs, clearances, and discriminatory licenses and other practices which we found to be unlawful, * * *." And in commenting upon the subject of clearances after the remand, the expediting court stated, D.C., 85 F.Supp. 881, 897, "Our disposition of clearances was in no way altered by the Supreme Court." After the remand and before the decrees were entered on the evidence submitted on the rehearing as to the matters to be reconsidered by the expediting court, the consent decrees of RKO and Paramount were entered. The purpose of the provision which exempts the application of Section 16, Title 15 U.S.C.A., to consent decrees entered "before any testimony has been taken" is to induce defendants "in actions of that type to submit to prompt capitulation". De Luxe Theatre Corp. v. Balaban & Katz Corp., D.C., 95 F.Supp. 983, 986. It must be evident that there was no new trial on the issues of

runs and clearances when the Supreme Court remanded the matter to the expediting court. The remand was in effect a mere continuation of the first trial, with additional issues to be determined, none of which concerned the portions of the decree as to runs and clearances. And, moreover, the very recitals in the RKO decree indicate that the parties themselves recognized that the only reservation as to admission of the violation of the Sherman Act pertains to the issues upon remand and as to which no testimony had been taken. The RKO decree, Plaintiffs' Exhibit 344, stated,

"The RKO defendants having consented to the entry of this decree before the taking of any testimony upon the issues and matters open upon the remand of this cause, and without any findings of fact upon such issues and matters, and upon condition that neither such consent, nor this decree, nor the entry of this decree, nor any statement, provision or requirement contained in this decree, shall be or shall be construed as being an admission or adjudication or evidence that the allegations of the Petition or of the Amended and Supplemental Complaint, or any of them, are or is true in so far as they relate to the issues and matters so open, or that the RKO defendants, or any one or more of them, have or has violated or are or is violating any statute or law with respect to the issues and matters so open; * * *."

It will be observed, therefore, that the only reservation made with reference to any effect of the consent decree was as to matters relating to the issues which were open on remand.

■ So far as the Paramount decree is concerned, it appears that evidence had already been taken upon remand before there was any capitulation on the part of Paramount. The preamble reads (Plaintiffs' Exhibit 343),

"The Paramount defendants having consented to the entry of this judgment after the taking of evidence upon the remand of this cause by the Supreme Court to this Court but without rendition of any decision by this Court upon

any of the issues and matters which were to be determined upon said remand, without any findings of fact upon such issues and matters made after said remand, and without admission by the Paramount defendants in respect to any such issue or matter, * * *."

Under these circumstances, there can be no serious doubt as to the admissibility of the RKO and Paramount decrees, as well as the decrees entered against the other defendants. But the Minnesota Amusement Company objects to the decrees as being prima facie evidence as against it of any violation of the Sherman Act, in that it was not a party to the Paramount suit. Plaintiffs' position is that M.A.C. being a beneficiary of the local conspiracy, it cannot escape the effect of the evidentiary force of the national conspiracy, and, in addition, that the Paramount decrees should be prima facie evidence as to it because it is merely the alter ego of Paramount. As to this latter contention, the court does not find it necessary to decide. Suffice it to state that the decrees being admissible as to all of the distributor defendants, they constitute prima facie evidence as to them, and the Minnesota Amusement Company being a beneficiary and a part of the local conspiracy, which is a part of the national conspiracy, it cannot object to the admission of such evidence in that it having knowingly joined the conspiracy here, all acts of the conspirators in furtherance of the conspiracy necessarily are admissible as to it. Moreover, the evidence as to the local conspiracy is ample to sustain such finding as to the distributor defendants as well as M.A.C. without the evidentiary support of the decrees in the Paramount cases.

In April, 1948, this suit by Homewood was commenced, and in September, 1948, the defendant distributors made certain changes in the established system of runs and clearances in the City of Minneapolis. It is not necessary to determine whether such changes were made because of the pendency of this lawsuit or the exact manner in which the changes were brought about. In any event, since September 16, 1948, except for a short period, Homewood has been accorded a 28 day run and it does not now claim any discrimination as to it, and has not since that run was made available to it. It may be noted that, as soon as the 28 day run was offered to Homewood with the requirement of higher film rental, it was immediately accepted. The prompt acceptance by Homewood of the first offer made to it for a particular run tends to negate defendants' contention that, prior to September 16, 1948, an earlier run would have been available to it if it had been willing to pay the required film rental.

■ That the statute of limitations was tolled from July 20, 1938, the date of the institution of the Paramount cases, and remained tolled during the entire pendency of the Paramount cases, necessarily follows from the construction which well-considered decisions have placed upon Section 5 of the Clayton Act, 15 U.S.C.A. § 16, which provides, in part, that.

"Whenever any suit or proceeding in equity or criminal prosecution is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, the running of the statute of limitations in respect to each and every private right of action arising under said laws and based in whole or in part on any matter complained of in said suit or proceeding shall be suspended during the pendency thereof."

The Court of Appeals for the Eighth Circuit has considered this very question in Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846, and in view of that decision the matter of limitations offers no defense to any of the defendants. Moreover, the question is moot in view of the limitation on damages as hereinafter indicated.

■ That Homewood suffered some damage from the impact of the conspiracy is reasonably free from doubt. It is idle to argue otherwise in view of the admitted situation. For over 12 years it was relegated to a subordinate playing position to its chief competitor, which had the opportunity to select the better feature pictures in this particular suburban competitive area. Obviously, that is the reason why the 49 day run was accorded to the three M.A.C. suburban theatres, and later to Paradise.

412

In Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 256, 66 S.Ct. 574, 576, 90 L.Ed. 652, the court stated,

"The earlier a playing position, the more desirable it is, since it is preferable to exhibit pictures before they have been shown to the public in other theatres in the competitive area."

Therefore, the court is reasonably clear that the evidence fully establishes that some damages occurred to Homewood as the certain result of the wrong. Uncertainty arises as to the monetary value of the wrong that was inflicted. See, however, Eastman Kodak Company v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, and Story Parchment Company v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. And while the court is fully aware that the difficulty in determining the exact amount of damages is a risk of which the wrong-doing defendants cannot complain, the fact nevertheless remains that sound judgment must always be exercised in order to be free from basing damages upon sheer conjecture. The purpose of the Sherman Act and the protection granted therein to those who have been damaged by wrongdoers in violation thereof, should not be thwarted by making the act a haven for those who attempt to transform their actual damage into a fortuitous windfall.

Defendants contend that Homewood actually obtained more feature pictures clear of Paradise during this period than it showed subsequent to Paradise, but the computation of such figures is misleading because Homewood played many double feature shows in attempting to meet the competition of Paradise. It also played pictures produced by Columbia and United Artists, whose product Paradise did not play, at least to any substantial extent. Moreover, any subsequent run theatre necessarily exhibits many second-rate features clear of the prior run theatre because such films have no particular attraction for the prior run theatre. Then, again, in the selection of the better features by the prior run theatre, there are bound to be some feature pictures available which the prior run theatre cannot or does not care to exhibit. So a mere computation of so-called

feature pictures played at Homewood clear of Paradise is not persuasive in attempting to appraise the resulting damage to Homewood. The more convincing comparison is to select the pictures which both theatres desired to exhibit and this comparison, according to the evidence, indicates that, from 1935 to September, 1948, 99 of such feature pictures were played by Homewood day and date, or ahead of Paradise, while 1,049 played at Homewood subsequent to Paradise.

In presenting their testimony, plaintiffs sought to prove damages by (1) a comparison between the gross receipts of the Homewood and Arion Theatres between the years 1935 and 1948, the Arion Theatre being one operated by the Minnesota Amusement Company; (2) a comparison between Homewood's gross and the gross of all the United States motion picture theatres during the period in controversy; (3) a comparison between the gross receipts on pictures shown at Homewood subject to the alleged discriminatory clearance and pictures shown at Homewood which were not subject to that clearance. The court sustained the objection as to the second item, and after considerable evidence and a great deal of confusion as to the identification of pictures, plaintiffs abandoned any attempt to prove actual damages under the third item, but they contend that the tabulations in that regard are at least evidence of damage. Consequently, as the basis for the amount of damage, plaintiffs rely on the first item, the comparison between the gross receipts of the Homewood and Arion Theatres, and rely primarily upon Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, and Milwaukee Towne Corp. v. Loew's Inc., 7 Cir., 190 F.2d 561.

There is no showing by plaintiffs as to their net profits during this period. They content themselves with offering evidence only as to their gross receipts. They argue that the yardstick method of computing damages by comparing grosses of comparable theatres, subject to adjustment for differences in film rental, is reasonable, because regardless of the theatre's run, the overhead expense for rent, light, management, etc., is substantially the same, and as authority for the utilization of this method

they refer to Bigelow v. RKO Radio Pictures, supra. Plaintiffs urge that the Arion Theatre is comparable in size, appearance, facilities, etc., with a comparable diversity of population, and they contend that, if they could have enjoyed the run which was accorded to Arion during this period, they would have grossed a yearly income comparable to that theatre. In addition to the yearly grosses of Arion and Homewood during the years in question, there is in evidence the gross receipts of Paradise from 1934 to 1948. The evidence as to Paradise's gross was introduced as rebuttal evidence by plaintiffs to indicate that the gross of Paradise in 1934 and 1935 was less than the gross of Homewood, and hence it is argued that this evidence rebuts the contention of the distributors that they selected Paradise for the first run on the north side because of its greater grossing potentialities. However, in addition, it is the court's view that due consideration should be given to the evidence as to Paradise's grosses so far as it may aid the court in determining the amount of damages to Homewood. After all, that is the theatre which allegedly reaped the harvest of the discriminatory practices against Homewood. And although Homewood may be designated as a superior theatre, the two theatres are fairly comparable for comparison purposes in determining Homewood's damages. Mr. Berger, who now no longer operates the Paradise, and who was called as a witness for plaintiffs, stated that in his opinion the two theatres were "on a par", but between the two, he probably "would choose the Homewood." (Record, p. 889). Moreover, there is a basis for considering this evidence other than as rebuttal because both parties in their briefs have utilized the Paradise gross receipts in attempting either to sustain the claimed damage to Homewood or to minimize Homewood's damage. When Mr. Berger was on the stand during plaintiffs' case, he was examined by defendants as to any record of the receipts of Paradise during this period, and was specifically asked by defendants to bring in that testimony. This examination took place at the time Berger was called as a witness for plaintiffs in chief, and later when this testimony as to Paradise's gross receipts was offered by plaintiffs in rebuttal, objection was made and the court limited the offer to the rebuttal value of the testimony. But, in view of the request made by defendants at the time Berger first was examined to produce this testimony, it seems that the court in its discretion should not be deprived of full access to this testimony for any purpose that may be helpful in determining this difficult question of the amount of damages.

At the outset, the court cannot accept plaintiffs' theory as to the soundness of comparing the Arion's gross with Homewood's gross as the proper basis for computing damages. There is an absence of satisfactory evidence that Homewood's grossing potentialities equaled Arion's or that the two theatres are comparable for comparison purposes. Arion is a theatre located on Central Avenue, a busy retail street, where the neighborhood people come to trade, patronize the local restaurants, and do their shopping. The theatre is located in the center of a community business district. The immediate neighborhood consists of middle-class working people who to a large extent confine their trading and recreational activities to that particular area. And moreover, Arion has only one competitive theatre within walking distance; also, it underwent substantial improvements in about 1937. Homewood, on the other hand, while located on Plymouth Avenue where there are some business activities, finds itself on a street which has been largely exceeded in growth and business activities by Broadway Avenue, which is some seven blocks away. The Homewood is adjacent to a neighborhood of better-class homes occupied by people who are much more in the habit of seeing the better motion pictures at the earlier runs downtown than those in the Arion neighborhood. Instead of having merely one competing theatre within walking distance, Homewood has five competing theatres within a distance of 1.5 miles. Moreover, one cannot ignore the difficulties that Homewood has had throughout the years prior to the discrimination in becoming a lucrative business. In fact, during the year 1929, when Homewood was operated by the American Amusement Company, and while

it grossed that year $66,000, its net loss was $3,312.57. At that time, Homewood was on a 30 day run, with a film rental of about 33⅓ per cent of its gross, with an admission price of 30 cents. In 1934, before the impact of the discrimination, Homewood's net profit was not more than $3,371.13. Plaintiffs themselves characterized their theatre's grossing potentialities in a letter written by Martin Lebedoff to one of the defendant distributors in attempting to obtain an adjustment on film rental under date of July 1, 1947, as follows,

"* * * The Homewood has always been a problem theatre. Before the war it was a losing house, and in the big boom that struck our industry in the last five years it improved the Homewood to the place that it made a bare profit equal to a good theatre manager's salary. At best it is a very marginal operation, and we have to watch every dollar in order to show any profit at all.

"It is a poor grossing house for its size and capacity, * * *." (Warners Exhibit 35).

And while due consideration must be given to the theatre-going habits of people which may have redounded to Homewood's prejudice during the years it was running subsequent to Paradise, it is not without significance that, between September 17, 1948, and December, 1949, on the same pictures which were exhibited, Arion grossed $75,602 and Homewood grossed $55,996. This is the period when Homewood was on a straight 28 day run, and Arion was, part of the time, on a 28 day run and part of the time on a 42 day run. Arion, of course, was not a theatre in substantial competition with Homewood and the plaintiffs do not claim any damage as the direct result of any preference as to runs and clearances which may have been granted to Arion. It is the court's view, therefore, that other sources must be explored and analyzed in order to obtain the basis for a computation of reasonable damages to be allowed to Homewood.

When the Lebedoffs complained about the playing position of Homewood after Paradise was accorded the prior run on the north side, the only satisfaction which they received from the distributors was a lower film rental on the films which were licensed to them. Most of the films were rented on a flat rental to Homewood during this period rather than on a percentage basis. That the reduction in the film rental to Homewood was substantial is reasonably clear from the evidence. It is entirely probable that these concessions as to film rental were made by the distributors to Homewood in an attempt to mollify the Lebedoffs and to still their complaints. The following schedule lists the total box-office receipts of Paradise and Homewood between 1935 and September 16, 1948, inclusive:

| | Paradise Gross | Homewood Gross |
| --- | --- | --- |
| 1935 | $43,768.90 | $45,426.01 |
| 1936 | 54,575.80 | 49,903.65 |
| 1937 | 50,031.99 | 43,720.65 |
| 1938 | 44,196.40 | 45,272.75 |
| 1939 | 45,635.90 | 44,517.59 |
| 1940 | 43,571.50 | 40,876.62 |
| 1941 | 43,903.30 | 39,470.57 |
| 1942 | 47,311.16 | 37,989.75 |
| 1943 | 51,938.08 | 47,287.07 |
| 1944 | 57,498.51 | 48,251.53 |
| 1945 | 57,367.48 | 45,496.99 |
| 1946 | 66,815.29 | 48,003.39 |
| 1947 | 76,731.66 | 52,411.57 |
| To Sept. 16, 1948, incl. | 61,094.45 | 37,135.64 |
| | $744,440.42 | $625,763.78 |

It will be observed that, between 1935 and 1942, the total gross receipts of Paradise and Homewood did not vary substantially. It was after 1942 that Paradise began to outstrip the gross receipts of Homewood to any substantial extent, and it was during these years that apparent pecuniary loss was sustained by Homewood as the result of the conspiracy. We have no satisfactory showing as to Homewood's earnings for any substantial period prior to the conspiracy, and therefore no comparison between Homewood's gross prior to 1935 and after 1935 can be made. Manifestly, it is difficult to determine the effect of various economic factors on the shifting and fluctuating grosses of any motion picture theatre. It is possible, of course, that, absent the discrimination, Homewood would have shown greater gross receipts for the period in question than Paradise actually obtained during this period. On the other hand, the advent of Mr. Berger, an experienced theatre man, as manager of Paradise, undoubtedly had its effect on Paradise's being transformed from a marginal theatre operation to a thriving one.

Plaintiffs also stress the continuation of the effect on Homewood after the discrimination ended on account of being relegated to a run behind Paradise for so many years, and Homewood contends that the experience of the two theatres after September 16, 1948, is evidence of that. Defendants, however, stress this phase of the evidence as indicating Paradise's better grossing potentialities. The following table reflects the gross box-office receipts of the two theatres and the respective film rentals paid to the defendant distributors on the same pictures from September 17, 1948, to November 30, 1950, inclusive (Defendants' Exhibit 3):

| Distributor | Homewood Gross Receipts | Film Rental | Paradise Gross Receipts | Film Rental |
|---|---|---|---|---|
| Fox | $17,790.93 | $5,548.63 | $23,581.24 | $7,417.18 |
| Loew's | 18,804.78 | 6,063.62 | 23,754.35 | 7,859.68 |
| Warners | 15,290.12 | 4,504.81 | 21,956.37 | 6,625.41 |
| Paramount | 9,238.87 | 3,121.74 | 12,121.14 | 3,787.74 |
| RKO | 6,085.08 | 2,097.10 | 7,439.65 | 2,118.24 |
| Universal | 6,665.06 | 1,926.91 | 9,132.20 | 2,410.57 |
| | $73,874.84 | $23,262.81 | $97,984.95 | $30,218.82 |

However, the extent to which the habit of the theatre-going public in recognizing Paradise as a first run theatre for these many years may have influenced the grosses of these two theatres is, of course, impossible to appraise.

Among other methods plaintiffs assume for the purpose of computing damages to compare the respective box-office grosses of Paradise and Homewood in the year 1934 when Paradise grossed $26,760.05 and Homewood grossed $34,101.32, and in that Homewood's gross was 127.4 per cent of Paradise's gross, plaintiffs assume to multiply the actual Paradise gross for each year from 1935 through to 1948 by 127.4 per cent, and that, according to plaintiffs, represents the gross that Homewood could normally expect if it had not been divested of its playing position by the wrongful acts of the defendants. But, clearly, the computation which plaintiffs make by taking the one year of 1934 as indicative of the difference in the grossing potentialities of the two theatres from 1935 to 1948 is manifestly unsound. One cannot assume that 1934, a depression year, depicts the normal future for Paradise, when it is reasonably probable that, without the benefit of any preference from the distributors, and with the advent of new management, the future grosses of Paradise might be greatly increased as compared with the 1934 income. One could assume with as much propriety to compare the grosses of Homewood and Paradise in 1949, when Homewood had the preferred run over Paradise and during that year, in comparing the production on the same pictures played at both theatres, but when Homewood played them first, the Homewood gross bore a rate of 72.4 per cent of the Paradise gross.

While plaintiffs do not recognize Paradise as a comparable theatre in determining damages by the comparison of grosses, and following the so-called yardstick theory, their theory of computing damages is that one must take the gross receipts of Paradise from 1935 to September 16, 1948, inclusive, which total $744,440.42, and compare that amount to the gross receipts of Homewood between these years, which total $625,763.78. The difference between these two figures is $118,676.64, and that figure represents the difference in the gross receipts before film rental is computed. Plaintiffs contend that, but for the conspiracy, plaintiffs would have received a box-office gross at least equal to Paradise's, and that the $118,676.64 represents Homewood's loss, subject, however, to adjustment for film rental. And considering the average film rental paid by Paradise during this period to be 25 per cent, plaintiffs take 25 per cent of $118,676.64 and obtain $29,669.16, and by subtracting that sum from $118,676.64, they obtain the alleged damage to them in the sum of $89,007.48. But the court is of the opinion that this method under the particular circumstances of this case presents a fallacious and entirely unrealistic picture of plaintiffs' actual pecuniary loss. The larger film rental which was paid by Paradise continued every year from 1935 to 1948, and to make the computation which plaintiffs follow presents a totally artificial conception of plaintiffs' loss. A more satisfactory basis for ascertaining the pecuniary loss to Homewood is a comparison of the gross receipts of the two theatres, subject, however, to the computation of yearly net gross receipts after the payment of film rental in order to determine the actual difference in such receipts each year. A comparison of the box-office grosses of Paradise and Homewood reflect only a part of the story. Assuming that the expenses remained constant regardless of the run, and there is no showing to the contrary, it is the film rental which is the controlling factor in determining whether or not a theatre is being operated at a profit. If a subsequent run theatre makes as great a profit by reason of the differentiation in film rental as it would have made if it had been a first run theatre, one cannot find any sound basis for allowing damages—there is no pecuniary loss. The factor of continuing depreciation in gross receipts to Homewood by reason of the habit of the theatre-going public to continue their patronage of Paradise is too uncertain and conjectural in light of the evidence to justify the computation of any damages thereon.

Both parties in making their computations have assumed that 25 per cent of the gross is a reasonable film rental in computing Paradise's net gross, particularly during the early years of the conspiracy. The evidence is quite clear, however, that at least during the years 1946, 1947 and 1948, Paradise's film rental substantially exceeded 25 per cent; in fact, the evidence is quite conclusive from the figures heretofore recited that the average film rental of Paradise for 1948, for instance, was from 25 to 30 per cent. The record does not disclose the exact film rental paid by Homewood during the years in question. Defendants have made some computations on the basis of Paradise's paying 25 per cent rental from 1935 to 1948, and by comparing the film rental paid by Paradise and Homewood on a certain number of pictures during this period, they arrive at an average figure of less than 10 per cent of gross as representing the film rental paid by Homewood since 1941. Obviously, that figure is too low. But it is significant to note from an analysis of records which are available as to film revenue obtained by Loew's, Warners, Fox, Universal and RKO on all pictures purchased by Paradise and Homewood from 1934 to 1948 that the amount of rental paid by Homewood is on the average less than 50 per cent of the amount paid by Paradise. If, however, Paradise's film rental is computed on the basis of 25 per cent from 1935 to 1945, and 27 per cent for the years 1946, 1947 and to September 16, 1948, inclusive, then it would seem that such percentages will fairly reflect the amount of film rental paid by this theatre. And if we take a flat 14 per cent of the gross as indicating the film rental paid by Homewood, while this exact figure manifestly is an arbitrary one, it should, in light of all the circumstances, find a reasonable basis in the evidence and be reasonably accurate and fair

to all parties. The relative percentages, at least, are fairly accurate. Computing the film rental on these percentages, the following schedule reflects the net gross receipts of the two theatres after payment of film rental, and Homewood's gain or loss:

| | Paradise Gross | Percentage | Film Rental | Net |
|---|---|---|---|---|
| 1935 | $43,768.90 | 25 | $10,942.22 | $32,826.68 |
| 1936 | 54,575.80 | | 13,643.95 | 40,931.85 |
| 1937 | 50,031.99 | | 12,507.99 | 37,524.00 |
| 1938 | 44,196.40 | | 11,049.10 | 33,147.30 |
| 1939 | 45,635.90 | | 11,408.97 | 34,226.93 |
| 1940 | 43,571.50 | | 10,892.87 | 32,678.63 |
| 1941 | 43,903.30 | | 10,975.82 | 32,927.48 |
| 1942 | 47,311.16 | | 11,827.79 | 35,483.37 |
| 1943 | 51,938.08 | | 12,984.52 | 38,953.56 |
| 1944 | 57,498.51 | | 14,374.62 | 43,123.89 |
| 1945 | 57,367.48 | | 14,341.87 | 43,025.61 |
| 1946 | 66,815.29 | 27 | 18,040.12 | 48,775.17 |
| 1947 | 76,731.66 | | 20,717.55 | 56,014.11 |
| To 9–16–1948, incl. | 61,094.45 | | 16,495.50 | 44,598.95 |
| | $744,440.42 | | $190,202.89 | $554,237.53 |

| | Homewood Gross | Percentage | Film Rental | Net |
|---|---|---|---|---|
| 1935 | $45,426.01 | 14 | $ 6,359.64 | $39,066.37 |
| 1936 | 49,903.65 | | 6,986.51 | 42,917.14 |
| 1937 | 43,720.65 | | 6,120.88 | 37,599.77 |
| 1938 | 45,272.75 | | 6,338.17 | 38,934.58 |
| 1939 | 44,517.59 | | 6,232.46 | 38,285.13 |
| 1940 | 40,876.62 | | 5,722.72 | 35,153.90 |
| 1941 | 39,470.57 | | 5,525.88 | 33,944.69 |
| 1942 | 37,989.75 | | 5,318.57 | 32,671.18 |
| 1943 | 47,287.07 | | 6,620.18 | 40,666.89 |
| 1944 | 48,251.53 | | 6,755.20 | 41,496.33 |
| 1945 | 45,496.99 | | 6,369.58 | 39,127.41 |
| 1946 | 48,003.39 | | 6,720.48 | 41,282.91 |
| 1947 | 52,411.57 | | 7,337.62 | 45,073.95 |
| To 9–16–1948, incl. | 37,135.64 | | 5,198.99 | 31,936.65 |
| | $625,763.78 | | $87,606.88 | $538,156.90 |

| | Homewood's Gain | Homewood's Loss |
|---|---|---|
| 1935 | $ 6,239.69 | |
| 1936 | 1,985.29 | |
| 1937 | 75.77 | |
| 1938 | 5,787.28 | |
| 1939 | 4,058.20 | |
| 1940 | 2,475.27 | |
| 1941 | 1,017.21 | |
| 1942 | | $ 2,812.19 |
| 1943 | 1,713.33 | |
| 1944 | | 1,627.56 |
| 1945 | | 3,898.20 |
| 1946 | | 7,492.26 |
| 1947 | | 10,940.16 |
| To 9–16–1948, incl. | | 12,662.30 |
| | | $39,432.67 |

From 1935 to 1941, inclusive, Homewood suffered no loss. The figures indicate that, during those years, it had a larger net gross after the payment of film rental than Paradise. However, for the period from 1942 to September 16, 1948, inclusive, Paradise had a greater net gross than Homewood in every year except 1943, and these sums total $39,432.67. Obviously, in determining Homewood's damages, its so-called gains over Paradise should not be offset against its losses.

As stated, plaintiffs rely primarily upon the case of Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L. Ed. 652, as to the approved method of establishing damages in an alleged comparable situation, and plaintiffs, as stated, in computing damages on a comparison of the two theatres, simply subtract the box-office grosses and then make an adjustment for film rental on the difference between the two grosses. But that does not appear to be the method followed in the Bigelow case. In commenting upon the method of computing damages in that case by a comparison of the grosses of petitioners' theatre and the Maryland, the competing theatre, the Supreme Court stated, 327 U.S. at page 258, 66 S.Ct. at page 577,

"* * * The evidence showed that during the five year period, the Maryland's net receipts after deducting film rentals paid to distributors exceeded petitioners' like receipts by $115,982.34."

Petitioners' "like receipts" presumably represent the gross receipts of petitioners' theatre after payment of film rental. It would appear, therefore, that the film rentals paid were deducted from the grosses of both theatres, and then the difference was the basis the court adopted as one method of computing damages in submitting the case to the jury. In any event, in light of all the circumstances, the method of computing damages outlined heretofore impresses the court as one that is fair and reasonable to both parties, and while the amount of damages arrived at is at best an approximation, it is the most reasonable approximation which the evidence, fairly considered, sustains. The court, therefore, finds that plaintiffs sustained a pecuniary loss in the sum of $39,432.67 as the result of the wrongful acts of the defendant.

Plaintiffs also seek injunctive relief adequate to prevent the continuance or renewal of any of the illegal practices which the court has found to exist prior to September 16, 1948. The granting of an injunction rests primarily in the sound discretion of the court in view of the particular situation existing. The national conspiracy found to exist in the Paramount case is now restrained by a final decree entered therein. No good reason appears in light of this record which suggests the need or propriety of invoking the equitable interference of this court as requested.

At the close of the testimony, defendants made several motions to strike certain exhibits and testimony. Rulings were reserved. These motions will be denied.

After the briefs were filed, plaintiffs made a motion to strike the answering arguments and brief of the defendants upon the grounds that considerable portions thereof were impertinent, libelous, and scandalous. That motion also will be denied.

Findings of fact and conclusions of law consistent herewith may be presented by plaintiffs upon ten days' notice. At that time the court will hear the parties on the question of attorneys' fees to be allowed herein.

Exceptions are reserved.